**UNITED STATES of America, Plaintiff,**

v.

**Dan ANDERSON (01), Robert C. LaHue (03), Ronald H. LaHue (04), Defendants.**

Nos. 98–20030–01–JWL, 98–20030–03–JWL, 98–20030–04–JWL.

United States District Court, D. Kansas.

Oct. 6, 1999.

Memorandum and Order Denying Reconsideration Oct. 25, 1999.

Keith E. Drill, Ronald D. Lee, Jacqueline A. Cook, James R. Wyrsch, David A. Kelly, Wyrsch Hobbs Mirakian & Lee, P.C., Kansas City, MO, for Dan Anderson, defendant.

Robert J. Campbell, James E. Kelley, Jr, Lewis, Rice & Fingersh, L.C., Kansas City, MO, for Ronald Keel, defendant.

Bruce C. Houdek, Kansas City, MO, Robert C LaHue, Stillwell, KS, for Robert C. LaHue, defendant.

Anne M. Brafford, Bryan Cave LLP, Kansas City, MO, James L. Eisenbrandt, Jeffrey D. Morris, Bryan Cave LLP, Overland Park, KS, for Ronald H. Lahue, defendant.

Thomas E. Carew, Morrison & Hecker L.L.P., Kansas City, MO, Gerald A. Feffer, Williams & Connolly, Washington, DC, for Ruth Lehr, defendant.

Charles W. German, Scott M. Brinkman, Rouse, Hendricks, German, May & Shank,

Kansas City, MO, for Dennis McClatchey, defendant.

Michael D. Strohbehn, Walters, Bender & Strohbehn, Kansas City, MO, R. Stan Mortenson, Barry J. Pollack, Jody M. Kris, Miller, Cassidy, Larroca & Lewis, Washington, DC, for Mark Thompson, defendant.

Tanya J. Treadway, Office of United States Attorney, Topeka, William Bowne, U.S. Department of Justice, Washington, DC, for U.S.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

On April 5, 1999, following a nine week trial, a jury convicted the three defendants remaining in this case of various Medicare kickback offenses.[1] On August 16, 1999, the court held a status conference to discuss objections by the parties to the sentencing recommendations set forth in the Presentence Investigation Reports (PSIRs). As a result, the court ordered the parties to brief the issues raised in their objections (doc. 461). These papers are now before the court. In its brief, the government objects to the PSIRs' failure to recommend "vulnerable victim" enhancements and "role in the offense" enhancements to the defendants' sentences. The government also objects to the application of a "special skills" enhancement to the defendants' sentences. Further, the government asks the court to order each defendant to make restitution. In their briefs, each of the defendants objects to the following: the version of the offense stated in the PSIRs, the "use of special skills" or "abuse of trust" enhancement to their sentences, and the method used by the PSIRs to calculate the amount of the bribes made by the LaHues and paid by Baptist Medical Center (Baptist) at the discretion of Mr. Anderson. Mr. Anderson and Ronald LaHue also seek a "mitigating role" reduction in their sentences. Further, Robert LaHue objects to the PSIR recommendation that an "obstruction of justice" increase be added to his sentence. Finally, Ronald LaHue requests that the court not impose a fine upon him.[2] The court is well aware of the facts in this case, having presided over the nine week trial, and is now prepared to rule.

For the reasons set forth below, the court overrules the government's objection as to the "vulnerable victim" enhancements. The court sustains the government's objection as to the "role in the offense" enhancements for Robert LaHue and Mr. Anderson, but overrules the objection as to Ronald LaHue. The court sustains the parties' objections as to the "use of special skills" enhancements. The court sustains the defendants' objections as to the version of the offense and as to the "abuse of trust" enhancements. The court overrules Mr. Anderson's and Ronald LaHue's objections as to the "mitigating role" reduction. The court sustains in part, overrules in part, and defers deciding in part the defendants' objections to the calculation of the amount of the bribes. Finally, the court defers deciding the government's objection as to restitution, Robert LaHue's objection as to "obstruction of justice," and Ronald LaHue's objection as to the imposition of a fine.

## I. Background[3]

Defendants Drs. Robert and Ronald LaHue are osteopathic physicians and were

---

1. The jury also convicted defendant Dennis McClatchy, but the court subsequently granted Mr. McClatchy's motion for acquittal and, in the alternative, for a new trial (doc. 455).

2. The defendants' briefs also present arguments for downward departure, but the court will defer addressing these arguments until

the sentencing hearing scheduled for October 25, 1999.

3. Only the bare facts of this case are set out here for the readers' convenience. A more complete rendition of the facts can be found in the court's July 21, 1999, Memorandum and Order (doc. 455). *United States v. Anderson*, 85 F.Supp.2d 1047 (D.Kan.1999).

the longtime principals of a now-defunct organization called Blue Valley Medical Group ("BVMG"). BVMG was wholly owned by Robert LaHue, and Ronald La-Hue was at all times a key employee. The LaHues built their practice by treating patients in nursing homes, rather than operating out of a clinic. Defendant Dan Anderson was the President and Chief Executive Officer of Baptist. As discussed in the court's July 21, 1999 order, evidence presented at trial showed that the LaHues entered into agreements with a number of hospitals, including Baptist, under which the LaHues would refer patients to a particular hospital in exchange for various forms of compensation by the hospitals. This evidence was enough to convince the jury that the defendants committed conspiracy pursuant to 18 U.S.C. § 371 and violations of the Medicare Anti–Kickback Act pursuant to 42 U.S.C. § 1320a-7b(b). The court is left with the task of sentencing the defendants in accordance with the United States Sentencing Guidelines (U.S.S.G.).

## II. Vulnerable Victim Enhancement

The government's first objection is that the PSIRs do not recommend a two-level "vulnerable victim" enhancement to the defendants' sentences. The crux of the government's argument is that the elderly patients treated and referred by the La-Hues were "vulnerable victims." [4]

U.S.S.G. § 3A1.1(b)(1) requires a two level enhancement "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." Pursuant to sentencing commission commentary, a "vulnerable victim" is "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct) and (B) is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 cmt. 2. The defendants do not dispute that the elderly patients of BVMG who were the subject of the referral scheme were "vulnerable," [5] rather, the key question is whether the elderly patients of BVMG were "victims." Because the government has presented no evidence that the patients suffered any actual or intended harm or loss, the court determines that they were not "victims" and overrules the government's objection.

Although the Tenth Circuit has not specifically defined "victim" in this context, the case law almost uniformly suggests that a "victim" can only be a person who suffers actual or intended harm or loss. *See United States v. Whitlow*, No. 96–3246, 1997 WL 546003, 1997 U.S.App. LEXIS 23531, at *8–9 (10th Cir. Sept. 5, 1997) (defendant called elderly people, told them that he was their grandson, and requested money); *United States v. Gill*, 99

---

4. In its original objection to the PSIRs the government also argued that the Medicare supplement insurance companies and the Baptist Hospital Trustees were "vulnerable victims." In its subsequent Memorandum and Reply brief, however, the government only argued that the patients were "vulnerable victims." Thus, the court will consider the government's argument as to the insurance companies and hospital trustees waived.

5. There is little doubt that the patients were "vulnerable" because they were much more susceptible to the criminal conduct that occurred here than younger Medicare patients would have been. *See, e.g., United States v. Hardesty*, 105 F.3d 558, 560 (10th Cir.1997) (90 year old clients of attorney were vulnerable victims because of their age, medical, and

physical needs as they advanced in years, and their obvious inexperience in the matters in which they sought the attorney's help); *United States v. Gill*, 99 F.3d 484, 486 (1st Cir. 1996) (despite rule that it is generally improper to rely on a specific victim's class characteristics in making vulnerable victim determination, *see, e.g., United States v. Creech*, 913 F.2d 780, 782 (10th Cir.1990) ("We believe the court's finding was clearly erroneous because it did not focus on the [specific] victim, but rather upon a class of persons to which the victim belonged."), district court properly inferred that at least some of a large class of victims were unusually vulnerable to pseudo-psychologist's fraud where victims were community health center patients duped into thinking defendant was a licensed mental health counselor).

F.3d 484, 485 (1st Cir.1996) (defendant treated mental health patients after falsely telling them that he was a licensed psychologist); *United States v. Bachynsky,* 949 F.2d 722, 736 (5th Cir.1991) (defendant falsified patient diagnoses and provided bogus treatments in order to receive enhanced payments from medical insurers and Department of Defense); *United States v. Echevarria,* 33 F.3d 175, 180 (2d Cir.1994) (defendant "directly targeted those seeking medical attention by posing as a physician, exploiting their impaired condition and luring them to his inadequate and dangerous medical attention for the purposes of defrauding third-party medical insurers"); *United States v. Borst,* 62 F.3d 43, 48 (2d Cir.1995) (defendant's criminal activity of defrauding banks in connection with brokering of loans for financially destitute borrowers was subject to enhancement because defendant's criminal conduct caused specific financial and other loss to the destitute borrowers); *United States v. Wright,* 160 F.3d 905, 909 (2d Cir.1998) (residents of mentally retarded care facility were vulnerable victims where embezzlement of monies of care facility deprived residents of any semblance of adequate care); *United States v. Burgos,* 137 F.3d 841, 844 (5th Cir.1998) (patients of psychiatrist who committed billing fraud were vulnerable victims because they suffered harm; they were often needlessly admitted to the hospital and their stays were extended due to efforts to exhaust their insurance benefits); *United States v. Yount,* 960 F.2d 955, 956 (11th Cir.1992) (institutionalized elderly were vulnerable victims where defendant bank employee embezzled funds from their accounts even though bank ultimately reimbursed the accounts; defendant intended to embezzle money from trust accounts of elderly and had he not gotten caught the account holders would have lost their money).

■ The government argues that if a person is used as an instrumentality of the defendant's crime, then that person is a "victim," regardless of not having suffered harm or loss. All but one of the cases that the government cites, however, involve victims who have suffered actual or intended harm or loss. Furthermore, the court declines to follow *United States v. Stewart,* 33 F.3d 764 (7th Cir.1994), the one case holding that "victims" need not have suffered a concrete loss. The *Stewart* court held that the district court committed clear error in refusing to enhance for vulnerable victims where the defendant's scheme was to defraud funeral homes by inducing them to sell burial expense annuity arrangements to elderly customers. *Stewart,* 33 F.3d at 770. The funeral homes forwarded the defendant cash paid by elderly customers to purchase annuities, but the defendant embezzled the cash. *See id.* at 771. Although the funeral homes ultimately performed all the services that the elderly paid for, such that the elderly lost nothing, the court determined that the elderly were "vulnerable victims." *See id.* at 770–71. The *Stewart* court came to this finding by analogizing the facts in the case before it to the facts in *United States v. Newman,* 965 F.2d 206 (7th Cir.1992). *Id.* at 771 ("Thus, as in Newman, the defendant in this matter made his elderly clients the innocent instruments of his scheme ...."). *Newman,* however, involved a *vulnerable* 20–year–old who was threatened with harm and raped in order to induce her to defraud her family. *Newman,* 965 F.2d at 211–12. The *Newman* court held that the "vulnerable victim" enhancement should be applied, even though the vulnerable person and the people who lost money were different. The *Newman* holding does not apply to the facts in *Stewart,* or in this case, because in *Newman* the vulnerable person was harmed. In *Stewart* and in this case, however, the elderly were not harmed. Thus, *Stewart* was decided on faulty reasoning.

The court further declines to rely on *Stewart* because a now-superseded version of the sentencing guidelines may have influenced the *Stewart* court's conclusion. Under the guidelines then in effect, enhancement was appropriate if "an unusually vulnerable victim is made a target of

criminal activity." *See* U.S.S.G. app. C, amend. 521. In contrast, under the guidelines applicable to Mr. Anderson and the Drs. LaHue, enhancement is appropriate only if there is "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable ...." U.S.S.G. § 3A1.1 cmt. 2. The elderly in *Stewart* might be said to be "a target of criminal activity" under the then-applicable guidelines, even though they might not be "victim[s] of the offense of conviction and any [other relevant] conduct" under the current guidelines.

Finally, the court does not believe that *Stewart*'s reasoning should be extended to cover this case because of the factual differences in the two cases. The supposed victims in *Stewart* were much more directly tied to some concrete loss than the elderly patients in this case. The *Stewart* defendant preyed on the susceptibility of elderly individuals to facilitate a fraud on funeral homes; *Stewart* was not a case where elderly patients were merely subjects of a referral scheme that provided them with appropriate and necessary care that might not otherwise have been provided.

Rather than follow *Stewart*, the court now follows the majority rule that one must suffer actual or intended harm or loss to be considered a "victim." The government has failed to show that the patients were harmed in any way. As the court noted in its July 21, 1999 Memorandum and Order (doc. 455), "there was no evidence at trial that the referred patients received substandard care .... There was also no evidence at trial that the referral relationship affected patient choice. To the contrary, where patients or their families expressed a hospital preference, BVMG worked to honor the request. There was, moreover, no evidence at trial that any patient received unnecessary services." *United States v. Anderson*, 85 F.Supp.2d at —— 1999 WL 588213, at *4 (D.Kan.1999). The government has indicated that it will not present additional evidence on this issue at the sentencing hearing. The lack of evidence proving that the patients were "victims" pursuant to U.S.S.G. § 3A1.1 cmt. 2 leads the court to overrule the government's objection regarding the absence of a "vulnerable victim" enhancement in the PSIRs.

## III. Role in the Offense Enhancement

Next, the government seeks a four-level enhancement for each defendant for his organizational or leadership role in the offense. Pursuant to U.S.S.G. § 3B1.1(a), "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive" the court must increase by four levels. In the alternative, the government seeks a three-level enhancement for each defendant for his managerial or supervisory role in the offense. Pursuant to U.S.S.G. § 3B1.1(b), "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive" the court must increase by three levels.

In determining whether to apply a U.S.S.G. § 3B1.1 enhancement, the court should consider several factors, including:

the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*United States v. Anderson*, 189 F.3d 1201, 1210 (10th Cir.1999) (quoting U.S.S.G. § 3B1.1 cmt. 4). "The gravamen of the enhancement is either the exercise of control over other participants or the organization of others for the purpose of carrying out the crime." *United States v. Tagore*, 158 F.3d 1124, 1131 (10th Cir.1998). "There can, of course, be more than one

person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1 cmt. 4.

The court begins its analysis by noting that five or more participants were undisputably involved in the criminal activity; at least Dan Anderson, Robert LaHue, Ronald LaHue, Tom Eckard, and Ron Keel were criminally culpable in the proven scheme.[6] *See* U.S.S.G. § 3B1.1 cmt. 1 ("A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."); *see also United States v. Allemand,* 34 F.3d 923, 931 (10th Cir. 1994). Next, the court finds that enhancement under a "leader," "manager," or "supervisor" theory requires some showing that the defendant had "control over others" in the criminal conspiracy. *See United States v. Valdez–Arieta,* 127 F.3d 1267, 1272 (10th Cir.1997). The government need not prove, however, that a defendant controlled five or more participants; proof of control over one other person is sufficient to apply the enhancement. *See* U.S.S.G. app. C, amend. 500 ("To qualify for an adjustment under [section 3B1.1,] the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."); *United States v. Cruz Camacho,* 137 F.3d 1220, 1224 (10th Cir.1998) ("The government does not have to prove that defendant controlled five or more participants. Instead, it must prove that five persons participated in the criminal venture, and that defendant exercised leadership control over at least one person."). Finally, the court is cognizant of the divergent "organizer" standard—absolutely no finding of control is necessary to support an enhancement for acting as an "organizer." *Tagore,* 158 F.3d at 1131 (quoting *Valdez–Arieta,* 127 F.3d at 1272). "A defendant may receive an enhancement as an organizer for 'devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy.'" *Tagore,* 158 F.3d at 1131 (quoting *Valdez–Arieta,* 127 F.3d at 1272). For the reasons set forth below, the court concludes that Mr. Anderson and Robert LaHue were leaders and organizers, mandating that each receive a four-level sentence enhancement. The court finds, however, that Ronald LaHue, was solely a participant in the criminal scheme; a "role in the offense" increase to his sentence is inappropriate. Thus, the court overrules the government's objection as to Ronald La-Hue.

### A. Defendant Dan Anderson

Mr. Anderson's sentence requires a four level enhancement both because of his leadership role and his organizer role. Applying the *Tagore* standard, Mr. Anderson qualifies as an "organizer." *Tagore,* 158 F.3d at 1131. First, Mr. Anderson was instrumental in devising the

---

**6.** Moreover, the criminal activity was probably "otherwise extensive" under Tenth Circuit law:

> [T]he sentencing court is free to consider the use of unwitting outsiders in determining if a criminal enterprise is "extensive" within the contemplation of section 3B1.1. The extensiveness of a criminal activity is not necessarily a function of the precise number of persons, criminally culpable or otherwise, engaged in the activity. Rather, an inquiring court must examine the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme.

*United States v. Yarnell,* 129 F.3d 1127, 1139 (10th Cir.1997) (quoting *United States v. Dietz,* 950 F.2d 50, 53 (1st Cir.1991)); *see also* U.S.S.G. § 3B1.1 cmt. 3 ("In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three [criminal] participants but used the unknowing services of many outsiders could be considered extensive."). The kickback scheme here lasted nearly ten years and involved dozens of unwitting individuals at Baptist, BVMG, and (as to the Drs. LaHue) other hospitals. The scheme was complex and, in terms of the number of patients referred and the dollars and patients that changed hands, massive in scope.

criminal scheme. "The evidence at trial was overwhelming that it was Mr. Anderson ... who offered and paid remuneration to the LaHues. Specifically, Mr. Anderson directed the $150,000 annual payments to the LaHues and Mr. Anderson assigned Mr. Eckard to assist BVMG." *United States v. Anderson,* 85 F.Supp.2d at 1066 (D.Kan.1999) Second, Mr. Anderson provided the wherewithal to accomplish the criminal objective; he personally directed that $150,000 be payed annually to the LaHues. *See id.* at 1065. Finally, Mr. Anderson coordinated and oversaw the implementation of the conspiracy by directing others to carry out the scheme despite his knowledge that the conduct was illegal. For example, even when Baptist attorney Mark Thompson informed Mr. Anderson that the agreement with the LaHues did not conform to Medicare safe-harbor regulations, Mr. Anderson refused to bring the contracts into compliance and directed Mr. Eckard to continue his service for the LaHues. *See id.*

Mr. Anderson also qualifies as a "leader" under the 10th Circuit's enumerated factors for analyzing a defendant's role in the offense. *See United States v. Anderson,* 189 F.3d 1201, 1210 (10th Cir. 1999). First, Mr. Anderson exercised decision-making authority by resolving to make monthly payments to the LaHues and continuing to provide Mr. Eckard's services to the LaHues free of charge. Undisputed evidence shows that Mr. Anderson was the individual with whom the LaHues negotiated the original agreement in 1984–85; over the years, Mr. Anderson signed all but one agreement between Baptist Hospital and the LaHues. Second, the nature of Mr. Anderson's participation was that the scheme was, in one witness' words, "Dan Anderson's deal." Mr. Anderson ordered the illegal remuneration and continuously took steps to insure that Baptist's relationship with the LaHues remained amicable. Third, although some evidence at trial suggested that Mr. Anderson left the details of the referral

scheme to others, the government met its burden of proving that Mr. Anderson was intimately involved in planning the large picture of the referral scheme. Mr. Anderson directed and approved all of the benefits which Baptist conferred on the LaHues. Finally, Mr. Anderson had ultimate control over the jobs of Mr. Keel and Mr. Eckard; he used both men to carry out the criminal scheme. Although there is little evidence that Mr. Anderson was involved in recruiting accomplices, that factor is largely outweighed by the extensive role he otherwise played in the scheme. Further, because of the unique circumstances in this case, the court does not weigh the "claimed right to a larger share of the fruits of the crime" factor in its decision. Unlike a typical drug conspiracy, for example, the defendants here did not have a common pot of money from which they apportioned funds based on each defendant's role in the scheme.

Mr. Anderson attempts to downplay the evidence of his leadership and organizer roles by arguing that he was no more culpable than the LaHues. However, Mr. Anderson's role in the offense must be analyzed in view of the entire criminal scheme, not by a comparison solely to the roles of the other convicted defendants. *See United States v. Knox,* 124 F.3d 1360, 1366 (10th Cir.1997) (holding that evidence that others were leading figures did not undermine the determination that defendant was a leader or organizer); U.S.S.G. § 3B1.1 cmt. 4. ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."). As discussed above, Mr. Anderson was a leader and an organizer of the overall remuneration scheme between Baptist Hospital and the LaHues, thus mandating a four-level sentence enhancement.

**B. Defendant Robert LaHue**

■ Similarly, Robert LaHue's sentence requires a four-level enhancement both because of his leadership role and his orga-

nizer role. Robert LaHue meets the standard for "organizer" as set forth above. *See Tagore*, 158 F.3d at 1131. First, Robert LaHue devised the criminal scheme of referring patients to hospitals in return for various forms of compensation. Second, Robert LaHue provided the wherewithal to accomplish the criminal objective, as he provided the hospitals with patients from the medical group that he owned and controlled. Finally, Robert LaHue coordinated and oversaw the implementation of the referral relationships. He was a key participant in the planning of the bribery scheme and directed Mr. Eckard to facilitate the patient referral process. The court has previously concluded that, in addition to continuously negotiating with Baptist, Robert LaHue "was clearly involved in the relationships with all the non-Baptist hospitals." *United States v. Anderson*, 85 F.Supp.2d at 1062 (D.Kan. 1999).

Under the enumerated factors for analyzing a defendant's role in the offense, Robert LaHue should also be termed a "leader". *See United States v. Anderson*, 189 F.3d 1201, 1210 (10th Cir.1999). First, Robert LaHue had the ultimate decision making authority of where to send his patients and whether to solicit a particular hospital to participate in a kickback arrangement. Second, Robert LaHue was intimately involved in the offense by soliciting and receiving remuneration, by directing the actions of Mr. Eckard, and by directing BVMG physicians to refer patients to particular hospitals. Third, he attempted to recruit accomplices by authorizing Mr. Eckard to solicit other hospitals. Fourth, as previously discussed, Robert LaHue participated in planning the logistics of the scheme. Finally, Robert LaHue exercised control and authority over Mr. Eckard and BVMG physicians; he directed Mr. Eckard to solicit bribes from non-Baptist hospitals and directed BVMG physicians to refer their patients to particular hospitals.

Robert LaHue makes an argument similar to Mr. Anderson's that he is no more culpable in the offense than the other defendants. As the court has noted above, however, a defendant's role in the offense must be analyzed in view of the entire criminal scheme. Robert LaHue clearly was a leader and organizer of the overall remuneration-for-patients scheme.

## C. Defendant Ronald LaHue

 Unlike his co-defendants, Ronald LaHue was not a leader, organizer, manager, or supervisor of the Medicare kickback scheme. Rather, he solely committed the crimes that he was convicted of, bribery and conspiracy, while doing little else. As the Tenth Circuit recently held in *Anderson*, committing the crime of conviction will not alone support a "role in the offense" enhancement. See *United States v. Anderson*, 189 F.3d 1201, 1211 (10th Cir.1999). First, Ronald LaHue cannot be defined as an "organizer" of this crime scheme. Although there is some evidence that Ronald LaHue helped his brother Robert LaHue devise the remuneration scheme, the government has not proven that the additional "organizer" requirements are present. *See Tagore*, 158 F.3d at 1131. In the first place, Ronald LaHue did not have the wherewithal to accomplish the criminal scheme. The evidence showed that Robert LaHue owned BVMG and developed BVMG policies. Robert LaHue, not Ronald LaHue, had the ability to direct the physicians at BVMG to send their patients to a particular hospital. Moreover, Ronald LaHue did not coordinate the conspiracy, Mr Anderson and Robert LaHue did. Ronald LaHue did little more than negotiate his own contract with Baptist and participate in discussions which would effect that contract. Other than overseeing his personal contract, Ronald LaHue worked primarily as a staff physician at BVMG under the direction of his brother. Although the government presented evidence showing that Ronald LaHue recommended that BVMG solicit Bethany Medical Center (Bethany), the solicitation only occurred after Robert LaHue approved the idea. And although

Ronald LaHue accompanied Robert La-Hue and Mr. Eckard to a meeting with Liberty, no evidence revealed Ronald La-Hue's role in the meeting. The court has previously determined that the evidence is insufficient to prove that Ronald LaHue was involved with negotiations at any other hospitals. *See United States v. Anderson,* 85 F.Supp.2d at 1062 (D.Kan. 1999).

Second, Ronald LaHue is not a "leader," "manager," or "supervisor" under the factors enumerated by the Tenth Circuit for analyzing a defendant's role in the offense. *See United States v. Anderson,* 189 F.3d 1201, 1210 (10th Cir.1999). First, as discussed above, Ronald LaHue had very little decision-making authority in the scheme. For example, no contracts were entered into with hospitals without the permission of Robert LaHue. Second, Ronald LaHue's participation in the offense was similar to the defendant's participation in *Anderson*—each played a definite role in the criminal scheme, but neither played a leadership role. In *Anderson,* the defendant was convicted of conspiracy to distribute and possession with intent to distribute cocaine, and money laundering. *United States v. Anderson,* 189 F.3d 1201, 1210 (10th Cir. 1999). The evidence at trial showed that the defendant, Sylvester Anderson, among other things, picked up a drug "courier" at the airport, paid cash for two kilograms of drugs every two weeks, gave drugs to a drug "courier" for transport, and purchased a bus ticket for a drug "courier" after giving her a ride to the bus station. *See id.* at 1205–06. The Tenth Circuit determined that these actions showed that Sylvester Anderson committed the convicted offenses, but did not support a U.S.S.G. § 3B1.1 enhancement. Similarly, as discussed above, Ronald LaHue committed acts that support his convictions, but not acts above-and-beyond the offenses of conviction. Third, just as Sylvester Anderson did not recruit accomplices by associating with drug "couriers," *see id.* at 1211, Ronald LaHue

did not recruit accomplices by associating with hospitals that had agreements with BVMG. Robert LaHue and Mr. Eckard did most of the soliciting of hospitals. Fourth, as previously discussed, Ronald LaHue did not take an organizer role in the scheme. Finally, the government has failed to prove that Ronald LaHue exercised control over others. Mr. Eckard admitted at trial that Robert LaHue, not Ronald LaHue, was the primary source of his instruction. Further, even when Ronald LaHue suggested that Mr. Eckard solicit Bethany, Mr. Eckard did not attempt to do so until Robert LaHue approved. No evidence was presented that Ronald LaHue had any control over BVMG physicians and staff, either. Because Ronald LaHue does not satisfy U.S.S.G. § 3B1.1, the court denies the government's objection as to the lack of a "role in the offense" enhancement in his PSIR.

### IV. Abuse of a Position of Trust/Use of Special Skill Enhancement

The next objections pertain to the PSIR recommendations that a two-level enhancement be added to each of the defendants' sentences based on each defendants' use of a special skill or abuse of a position of trust. All parties agree that special skill enhancements are inappropriate. However, the defendants also object to the imposition of abuse of trust enhancements. For the reasons below the court sustains the parties' objections to special skill enhancements and further sustains the defendants' objections to abuse of trust enhancements.

██ Section 3B1.3 of the U.S.S.G. provides: "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." As the parties have noted, the defendants in this case clearly did not use special skills to facilitate the commission of their crimes. In *United States v. Gandy,* the Tenth Cir-

cuit held that "the mere fact that a defendant possesses a special skill is not enough to warrant his sentence being enhanced under Guideline 3B1.3.... Rather, the government must show and the court must find ... that the defendant used his special skill to facilitate the commission of the offense." *United States v. Gandy*, 36 F.3d 912, 915 (10th Cir.1994). Accordingly, the Tenth Circuit reversed and remanded because the district court improperly enhanced for use of a special skill the sentence of a podiatrist who was convicted of submitting false claims to Medicare.[7] The district court erred, held the Tenth Circuit, in that it failed to articulate "how Defendant used his podiatric skill to significantly facilitate the commission of the offense." *Id.* at 916. Although the Tenth Circuit did not foreclose the possibility that the district court might be able to articulate a basis for the enhancement on remand, it strongly hinted that such a finding would be inappropriate:

> We note that the [district] court's finding is problematic for another reason. The court's statement that '[i]f [Defendant] hadn't had [his skill] no fraud could have been committed by him,' seems to suggest that because Defendant is a podiatrist, a fortiori he used his special skill in the commission of his offense. As we have already explained, however, it must be shown not only that he possessed a special skill, but also that he used that special skill to facilitate the commission of the offense.

*Id.* at 916 n. 2. Like the situation in *Gandy*, it would be inappropriate to enhance in this case based merely on the LaHues' special skill as doctors. There is absolutely no indication that they used their medical skills to facilitate or conceal the kick-back scheme. As Mr. Eckard's successful efforts to entice Non–Baptist hospitals to enter into agreements with the LaHues indicate, no special skill was needed to collect remuneration in return for patients. The court will not enhance for use of special skills.[8]

 Likewise, the court does not find that any defendant abused a position of trust and will not enhance on that basis. For the abuse of trust adjustment to apply, "the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense." U.S.S.G. § 3B1.3 cmt. 1. "The primary concern of § 3B1.3 is to penalize defendants who take advantage of a position that provides them freedom to commit or conceal a difficult-to-detect wrong." *United States v. Trammell*, 133 F.3d 1343, 1355 (10th Cir.1998). Furthermore, the Tenth Circuit has made it clear that "[t]he question of whether an individual occupied a position of trust is evaluated from the victim's perspective." *Id.* Although there are no Tenth Circuit cases enhancing for abuse of trust in a bribery context, the Tenth Circuit has allowed abuse of trust enhancement in the fraud context in only "two categories of cases: (1) where employees abuse their position within their own organization to take advantage of the employer, and (2) where someone uses a 'fiduciary or personal trust relationship' to perpetrate the charged offense against the beneficiary of the trust.'" *United States v. Pappert*, 112 F.3d 1073, 1080 (10th Cir.1997). These standards will be applied to the defendants below.

---

7. Interestingly, like the LaHues, the defendant in *Gandy* "had no formal office and thus would visit various nursing homes and senior centers and offer his services to their residents." *Gandy*, 36 F.3d at 913.

8. Any attempt to find that Mr. Anderson used a special skill would also be meritless because it does not appear that he had a special skill as contemplated by the guidelines, *see* U.S.S.G. § 3B1.3 cmt. 3 (" 'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, and demolition experts."), and even if he did have a special skill there is no indication he used it to facilitate the commission of the offense.

## A. Defendant Dan Anderson

The court rejects the PSIR finding and the government's arguments that Mr. Anderson abused a position of trust. The government begins by asserting that Mr. Anderson abused a position of trust with Baptist Trustees, as a "fiduciary of the hospital's resources," by using Baptist resources to "violate the law, *i.e.*, to offer and pay illegal remunerations in return for the referral of Medicare patients." Government's Sent. Memo. at 54. The court finds, however, that because abuse of trust is measured from the victim's perspective, *see Trammell,* 133 F.3d at 1355, and neither Baptist nor its trustees were harmed, that Mr. Anderson did not abuse his position of trust with Baptist. To the contrary, Baptist was financially benefitted by the LaHue patient referrals. Further, trial evidence showed that the Baptist Trustees were kept fully informed of negotiations and transactions which Baptist entered into with the LaHues.

Next, the government argues that Mr. Anderson abused a position of trust with Baptist patients because he spent hospital money on the LeHue transactions, rather than on medical care. The court rejects this argument because Mr. Anderson clearly did not have an employer-employee relationship with the patients, and because the government has presented no evidence that Mr. Anderson owed the patients a fiduciary duty—in fact, he did not even interact with hospital patients.

The government makes a final attempt to establish the violation of a trust relationship between Mr. Anderson and Medicare. The government claims that Medicare relies on hospital executives to deal with Medicare fairly. However, "a Medicare-funded care provider, as a matter of law, does not occupy a position of trust vis-a-vis Medicare." *United States v. Mills,* 138 F.3d 928, 941 (11th Cir.1998). The government presents no specific evidence that Mr. Anderson was a fiduciary of Medicare. Rather, he and Medicare participated only in a series of arms-length transactions. Accordingly, the court sustains Mr. Anderson's objection to the PSIR abuse of trust enhancement.

## B. The Defendants LaHue

Neither of the two types of relationships recognized by the Tenth Circuit as allowing an abuse of trust enhancement was engaged in by the LaHues. *See Pappert,* 112 F.3d at 1080. First, BVMG, as the LaHue's employer, was benefitted, not harmed, by the LaHue's remuneration arrangements with hospitals. Thus, BVMG was not a "victim" from whose view point the court may assess the abuse of trust standard. *See Trammell,* 133 F.3d at 1355. Similarly, although the LaHues occupied a position of trust with their patients, the patients were not harmed and are therefore not "victims."

The second type of relationship is not present here, either, because the LaHues did not have a fiduciary relationship of trust with Medicare. In a case with facts similar to those in this action, the Tenth Circuit held that something more than submitting claims to the United States is necessary for a physician to be deemed to occupy a position of trust with the government. *See United States v. Custodio,* 39 F.3d 1121, 1125 (10th Cir.1994). In *Custodio,* the Tenth Circuit affirmed the district court's decision not to enhance for abuse of trust the sentence of a doctor who contracted to perform medical services on a military base pursuant to the Civilian Health and Medical Program for the Uniformed Services (CHAMPUS) but who submitted false CHAMPUS claims:

We agree with the district court that something more than [the defendant's] being a CHAMPUS partner is required for the Government to meet its burden. The court could correctly find the wrong was difficult to detect [not because of some special position of trust held by the defendant, but] as a result of the way the CHAMPUS system worked and that [the defendant's] position did not allow him to make his wrongs more

difficult to detect, although it did allow him to abuse the system.

*Id.; cf. United States v. Kensington Hosp.,* 760 F.Supp. 1120, 1129 (E.D.Pa. 1991) (A civil Medicare Anti–Kickback case in which the court stated, "I find nothing in the relationship between the doctors and the United States that creates a fiduciary duty on the part of the physicians toward the government."). The LaHues did not abuse a position of trust with Medicare that provided them freedom to commit or conceal a difficult-to-detect wrong. A Medicare kickback scheme is inherently a difficult-to-detect wrong, and nothing about the LaHues' positions made the scheme more difficult to commit or detect in this case than it would have been in any other case.[9] *See Custodio,* 39 F.3d at 1125; *cf. United States v. Koehn,* 74 F.3d 199, 201 (10th Cir.1996) ("In every successful fraud the defendant will have created confidence and trust in the victim, but the [abuse of trust] sentencing enhancement is not intended to apply in every case of fraud.").

## V. Restitution

The government's final objection is to the failure of the PSIRs to recommend restitution for any defendant. The government asks the court for an order of restitution in one of four possible amounts: 1) the amount of the bribes, *see United States v. Vaghela,* 169 F.3d 729, 736 (11th Cir.1999) (in Medicare kickback scheme, "it is not unreasonable to assume that [Medicare] was overcharged in the amount of the kickbacks, and that the loss [Medicare] suffered was equivalent to that amount."); 2) the amount Medicare paid

the hospitals for inpatient services, under an unjust enrichment theory; 3) the amount Medicare reimbursed the hospitals through Medicare Cost Reports; or 4) as to Mr. Anderson, a percentage of his salary from 1984 through January 1995, on the theory that some percentage of his salary was earned from using dishonest services. For the reasons set forth below, the court finds that no restitution should be made in connection with the schemes at Baptist or Bethany. Accordingly, the court overrules the government's objection in regard to Mr. Anderson and in regard to the LaHues to the extent of their dealings with Baptist and Bethany. The court will defer deciding until the sentencing hearing whether or not the LaHues will pay restitution in connection with hospitals other than Baptist and Bethany.

U.S.S.G. § 5E1.1, along with applicable statutory provisions, governs sentences of restitution. The 1998 version of section 5E1.1 does not apply in this case because the offenses on which the defendants were convicted occurred prior to November 1, 1997; the court must apply the former version of section 5E1.1. *See* U.S.S.G. § 5E1.1(g)(1) (1998 version) ("This guideline applies only to a defendant convicted of an offense committed on or after November 1, 1997. Notwithstanding the provisions of [the guidelines detailing the 'one book' rule], use the former § 5E1.1 ('set forth in Appendix C, amendment 571 in lieu of this guideline in any other case.' ")). Former section 5E1.1 provides:

(a) The court shall—

---

9. In its papers the government relies on *United States v. Adam,* 70 F.3d 776 (4th Cir.1995) to support its position that because Medicare fraud is difficult to detect, the LaHues have a fiduciary relationship with Medicare. *Adam,* 70 F.3d at 782 (abuse of trust enhancement affirmed as not clearly erroneous in Medicare Anti–Kickback Act case because "welfare fraud is terribly difficult to detect because physicians exercise enormous discretion: their judgments with respect to necessary treatments ordinarily receive great deference"). However, because the Tenth Circuit

has spoken on this issue in a case with facts similar to those in this case, the court finds no reason to follow the law of another circuit. The court further notes that *Adam*'s analysis is somewhat flawed because it relies on a House Ways and Means Committee report that is apparently aimed at fraudulent billing practices without explaining how the report might apply to a kickback scheme. *See Adam,* 70 F.3d at 782 (citing H.R.95–393, 95th Cong., 1st Sess., pt. II, at 44 [sic, 47–48] (1977), *reprinted in* 1997 U.S.C.C.A.N. 3039, 3050).

(1) enter a restitution order if such order is authorized under 18 U.S.C. §§ 3663–3664; or

(2) if a restitution order would be authorized under 18 U.S.C. §§ 3663–3664, except for the fact that the offense of conviction is not an offense set forth in Title 18, United States Code, ... impose a term of probation or supervised release with a condition requiring restitution.

(b) *Provided* that the provisions of subsection (a) do not apply when full restitution has been made, or to the extent the court determines that the complication and prolongation of the sentencing process resulting from the fashioning of a restitution requirement outweighs the need to provide restitution to any victims through the criminal process.

18 U.S.C. § 3663(a)(1)(A) allows a sentence of restitution upon "a defendant convicted of an offense under this title." Where the offense of conviction includes a charge of aiding and abetting, 18 U.S.C. § 2, or where the defendant is convicted of conspiracy, 18 U.S.C. § 371, the defendant is subject to a sentence of restitution under section 3663(a)(1)(A), notwithstanding the predicate offense's failure to appear in Title 18. *See United States v. West Indies Transp. Inc.*, 127 F.3d 299 (3d Cir.1997); *United States v. Minneman*, 143 F.3d 274 (7th Cir.1998).

 Unlike other guideline applications, a restitution order cannot be based on the actual or intended gain to the defendant; it must be "based on the amount of *loss actually caused* by the defendant's offense." *United States v. Messner*, 107 F.3d 1448, 1455 (10th Cir.1997) (emphasis added); *United States v. Guthrie*, 64 F.3d 1510, 1516 (10th Cir.1995). The government has the burden to prove the amount of loss. *Messner*, 107 F.3d at 1455 (citing 18 U.S.C. § 3664(d) (1985) [now § 3664(e) (1999) ] ); *Guthrie*, 64 F.3d at 1516. Where more than one defendant has contributed to the loss of a victim, the court has the option of making each defendant liable for payment of the full amount of restitution or it may apportion liability among the defendants to reflect the level of contribution to the victim's loss and the economic circumstances of each defendant. *See* 18 U.S.C. § 3664(i). Moreover, the amount of loss must be offset by any benefit received by the victim. *Guthrie*, 64 F.3d at 1516.[10] The parties dispute whether the government or the defendants bear the burden of proving the amount of offset. The Tenth Circuit has not spoken on this burden of proof, but it has indicated that it is reversible error not to offset when the defendant raises the issue at sentencing. *See Guthrie*, 64 F.3d at 1516. 18 U.S.C. § 3664(e) states that "the burden of demonstrating amount of loss" is on the government, but the burden of demonstrating "other matters" is on "the party designated by the court as justice requires." Relying on this language, the Ninth Circuit has held that the act "allows the district court to determine who has the burden of establishing the offset." *See United States v. Crawford*, 169 F.3d 590, 593 n. 2 (9th

---

**10.** *Guthrie's* holding that amount of loss must be offset by any benefit received does not appear to be affected by the 1996 MVRA despite *Guthrie*'s partial reliance on the now-repealed 18 U.S.C. § 3663(e)(1) (1995) ("The court shall not impose restitution with respect to a loss for which the victim has received or is to receive compensation ...."). *Guthrie* remains viable because it also relied on 18 U.S.C. § 3663(b)(1)(B)(ii) ("The order may require that such defendant ... pay an amount equal to ... the value of the property on the date of sentencing, less the value ... of any part of the property that is returned."), which remains part of the statutory scheme after the Mandatory Victims Restitution Act (MVRA). Moreover, MVRA replaced the repealed section 3663(e)(1) with statutes that, although they are different in some respects, similarly support the *Guthrie* holding because they have the identical effect of precluding double recovery by victims. *See* 18 U.S.C. § 3664(f)(1)(B) (fact that victim was compensated by insurance company cannot be taken into account for purposes of determining amount of restitution sentence); 18 U.S.C. § 3664(j)(1) (where insurance company compensates victim's loss, restitution is payable to insurance company, not victim).

Cir.1999). Exercising its discretion, the court places the burden of coming forward with the amount of offset on the defendants because they are in the best position to come forward with evidence of any alleged benefits derived by the United States from the remuneration arrangement. The ultimate burden of persuasion concerning the amount of loss remains on the government.

■ Based on the above legal standards, the court finds that the only appropriate accounting for victim loss under the facts of this case is the amount of bribes or consulting fees for which the respective hospitals submitted Medicare Cost Reports and received reimbursement from Medicare. These amounts are the only amounts the government would not have had to pay but for the illegal remuneration schemes. The evidence at trial revealed that the only victim in this case, the federal government, suffered at most $65,716 in losses in connection with the scheme at Baptist, $147,092 in connection with the scheme at Bethany, $1,500 in connection with the scheme at St. Joseph's Medical Center, $0 in connection with the scheme at Deaconess Hospital, $140,540 in connection with the scheme at Alexian Brothers Hospital, and $0 in connection with the scheme at Liberty Hospital. These figures reflect the amount of "consulting fees" for which the respective hospitals sought and received Medicare reimbursement through Medicare Cost Reports.

Contrary to the government's assertions, it would be inappropriate to value the amount of loss on the amount of the consulting fees paid by the hospitals and received by the doctors because the government has failed to show any nexus between the amount of what it considers as the bribes and the amount of its loss. Rather, the evidence at trial indicated that the amount of the consulting fees had no relation to the amount of loss suffered by the government. The evidence was clear that the government did not pay for consulting fees that were not reflected on the cost reports; the hospitals paid these monies out of their own funds. There was, moreover, no evidence that any unnecessary treatments were performed at any hospital. At Baptist, there was even affirmative evidence that the parties had created specific checks against overutilization. Further, the system Medicare had in place paid fixed amounts for patient services. Thus, the consulting fees being considered in their entirety as kickbacks or bribes in this case do not reflect loss to Medicare because, as the evidence clearly showed, Medicare would have paid the same fixed amount of reimbursement regardless of the kickbacks or bribes. The kickbacks or bribes affected only the location (i.e. the hospital) at which a patient was treated, not the amount that Medicare paid to reimburse for the treatment. Accordingly, the amount of the consulting fees does not reflect the amount of the government's loss and the court will not use it as a yardstick for restitution.

Similarly, the government's claims that the amount of restitution should be based on the total amount Medicare paid the hospital for inpatient services or on a percentage of Mr. Anderson's salary have no merit. The Tenth Circuit has made it clear that restitution sentences must be based not on the amount of a defendant's unjust enrichment, but on the victim's actual loss. *See Guthrie,* 64 F.3d at 1516. Moreover, the Eleventh Circuit has expressly rejected the government's "total amount paid" theory in a similar Medicare kickback case. *See United States v. Vaghela,* 169 F.3d 729, 736 (11th Cir.1999) (reversing restitution sentence of total amount paid by Medicare because "[s]peculation that Medicare ends up paying for some medically unnecessary treatments and tests when kickbacks are provided in exchange for the referral of Medicare patients and services is insufficient to support the government's burden to prove actual losses in each particular case.").

■ Determining the amount of loss, *i.e.,* the amount of consulting fees submitted by the hospitals on Medicare Cost

Reports, does not end the court's restitution analysis. The court also must offset the loss amount by any benefit shown by the defendants to have been received by the victim, the United States. *See Guthrie,* 64 F.3d at 1516. Victims are not to be paid twice. *See United States v. Savoie,* 985 F.2d 612, 619 n. 9 (1st Cir.1993). Thus, in connection with Baptist and Bethany, the court will offset the amount of the government's loss by the amount that the government received in civil settlements from these two hospitals.[11] The government has received a settlement payment from Baptist in the amount of $17.5 million and from Bethany in the amount of $1.2 million. The government's losses related to these two hospitals were $65,716 and $147,092 respectively. The government has not offered any evidence to rebut the proposition that those very losses were taken into consideration in arriving at the amounts to be paid by the hospitals. Accordingly, no restitution is appropriate because, after the offset, the government suffered no loss. Given the greater economic resources of Baptist and Bethany relative to the defendants, it is appropriate to apportion the entire amount of restitution on the hospitals. *See* 18 U.S.C. § 3664(h) ("If the court finds that more than one defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the ... economic circumstances of each defendant."). Thus, the court orders no additional restitution to be paid based on any losses related to these two hospitals. The court will defer deciding until the sentencing hearing whether or not it will order restitution in connection with hospitals other than Baptist and Bethany. Although no payments have been received by the government from these hospitals, there may be other evidence of benefits received by the government that should be considered for offset.

## VI. Version of the Offense

The defendants object generally to the version of the offense stated in the PSIR, asserting that it is taken nearly verbatim from the government's proposed version of the offense submitted to the probation officer. The court agrees with the defendants that the PSIR version of the offense is not accurate. The court has set forth a more appropriate version of the offense, supported by the evidence introduced at trial, in its July 21, 1999 Memorandum and Order. Therefore, the court sustains the defendants' objections and finds that the offense occurred as stated in pages *1–20 of its earlier order. *See United States v. Anderson,* 85 F.Supp.2d 1047 (D.Kan. 1999).[12]

## VII. Amount of the Bribe Enhancement

The PSIRs recommend a fourteen-level enhancement for each defendant based on a calculation of the amount of bribes between $5 million and $10 million. *See* U.S.S.G. § 2B4.1(b)(1) (referencing U.S.S.G. § 2F1.1). The defendants contest this enhancement by arguing that the PSIRs apply the wrong guideline for determining the base offense level, use the wrong method for calculating the value of the bribes, and wrongly include certain

---

**11.** The court rejects the government's argument that, based on the ruling in *Savoie,* civil settlements should not be used to offset the amount of restitution owed. *See Savoie,* 985 F.2d at 619 ("Because the law will not tolerate privately negotiated end runs around the criminal justice system, we reject appellant's claim that the district court could no longer order him to make restitution"). The government misinterprets *Savoie. Savoie* does not *require* that the district court refuse to offset restitution by settlement, it only states that the district court *may* do so. *See also U.S. v. Sheinbaum,* 136 F.3d 443, 448 (5th Cir.1998) (concluding that "district courts possess the discretion to impose restitution orders in spite of civil settlements").

**12.** In accordance with Fed.R.Crim.P. 32(c)(1), the court has attached a written copy of this finding to each defendants' PSIR.

legitimate transactions as bribes. As discussed below, the court overrules the defendants' objection to the guideline used in the PSIRs to set the base offense level. The court defers ruling on the defendants' remaining objections until after it has had a chance to hear additional evidence and argument on the issues at the sentencing hearing.

### A. Appropriate Sentencing Guideline

■ The PSIRs recommend that the court apply U.S.S.G. § 2B4.1 as the guideline appropriate for determining the base offense level. Section 2B4.1 applies in cases of "Commercial Bribery and Kickbacks." It commands a base offense level of 8, see § 2B4.1(a), and commands a specific offense characteristics increase of "the corresponding number of levels from the table in § 2F1.1" if "the greater of the value of the bribe or the improper benefit to be conferred exceeded $2,000." § 2B4.1(b)(1). The defendants argue that the unique circumstances of this case, particularly that the defendants developed a complex system of care with no ill intent, mandate that U.S.S.G. § 2F1.1, rather than U.S.S.G. § 2B4.1, be applied for determining the base offense level. Section 2F1.1 applies to offenses involving fraud and deceit. The base offense level is 6, see § 2F1.1(a), and the specific offense characteristics increase is based on the amount of "loss" rather than the amount of the bribes. See § 2F1.1(b)(1).[13]

The court accepts the PSIR's use of section 2B4.1 as the guideline to determine the base offense level and overrules the defendants' request to use section 2F1.1 as the guideline to determine base offense level. U.S.S.G. § 1B1.2 requires the court to "[d]etermine the offense guideline in Chapter Two (Offense Conduct) most applicable to the offense of conviction." There is little doubt that section 2B4.1,

and not section 2F1.1, meets this criterion. First, the Guidelines themselves require this conclusion. Section 2B4.1 applies by its title to "commercial bribery and kickbacks," and the statutory provisions referenced in section 2B4.1 include 42 U.S.C. §§ 1395nn(b)(1) and (2), the former statutory home of the Anti–Kickback Act.[14] Moreover, the background notes to section 2B4.1 indicate that "[t]his guideline ... applies to ... [v]iolations of 42 U.S.C. §§ 1395nn(b)(1) and (b)(2), [which] involve the offer or acceptance of a payment to refer an individual for services or items paid for under the Medicare program."

Second, the court notes that the government has consistently prosecuted this case as a bribery case, not a fraud case. For example, the Superseding Indictment uses the terms "bribe," "bribes," or "bribery" thirty-four times, but only "fraud" or "defraud" twice. Although this case does involve some elements of fraud, it is predominantly a case of bribery and conspiracy to commit bribery. Thus, the court does not believe that the characterization of this case should now be changed from a bribery case to a fraud case.

Finally, courts that have addressed the issue have used section 2B4.1, to sentence in bribery cases and section 2F1.1 to sentence in false claims convictions. The Eighth Circuit affirmed the use of section 2B4.1 in determining the base offense level in the sentence of a psychologist who received payment from a hospital in exchange for referring patients to that hospital. See *United States v. Jain*, 93 F.3d 436, 442–43 (8th Cir.1996), *cert. denied.*, 520 U.S. 1273, 117 S.Ct. 2452, 138 L.Ed.2d 210 (1997). In the District of New Jersey a court recently applied section 2B4.1 in sentencing a defendant who pleaded guilty to bribing a podiatrist for Medicare referrals. See *United States v. Leon*, 2

---

**13.** Also, a 2 level specific offense characteristics increase would apply based on "more than minimal planning." See § 2F1.1(b)(2).

**14.** In 1987, the Medicare kickback offenses, former 42 U.S.C. §§ 1395nn(b)(1) and (2),

were consolidated with the Medicaid kickback offenses, former 42 U.S.C. §§ 1396h(b)(1) and (2), at 42 U.S.C. § 1320a–7b(b)(1) and (2) (1999).

F.Supp.2d 592, 593 & 596 (D.N.J.1998). In comparison, the Tenth Circuit and a court in the District of Massachusetts have used section 2F1.1 in determining the base offense level for false claims convictions, but not for bribery convictions. See *United States v. Laughlin*, 26 F.3d 1523, 1525 & 1530 (10th Cir.1994); *United States v. Skodnek*, 933 F.Supp. 1108, 1109 & 1111 (D.Mass.1996). Only the Fourth Circuit has impliedly upheld the use of section 2F1.1 in the sentencing of a bribery case. See *United States v. Adam*, 70 F.3d 776, 781 (4th Cir.1995). This case is not persuasive, however, because the Fourth Circuit only reviewed the district court's calculation of "loss," not whether the district court applied the correct guideline. The court therefore finds that the PSIRs properly applied section 2B4.1 in setting the base offense level and now overrules the defendants' objections on this issue.

## B. Calculation of the Value of the Bribe

■ The defendants' next argue that the value of the bribe should be a "net" value, calculated by decreasing the amount of the illegal remunerations by the value to the government of the legitimate services performed by those involved. Although the court agrees that the proportion of the remunerations given as part of legitimate business transactions, if any, should not be included when calculating the value of the bribe, the court reaches this conclusion by reasoning different from the defendants'. The court believes that two separate issues must be examined to determine the value of the bribe: 1) whether the value of the bribe should be a "net" calculation or a "gross" calculation; 2) what actually constitutes the "bribes."

Applying U.S.S.G. § 2B4.1(b)(1), the court is required to increase the base offense level by an amount corresponding to "the greater of the value of the bribe or the improper benefit to be conferred." All parties and the PSIRs agree that calculat-

ing the "improper benefit conferred" would be very difficult in this case, and that a calculation of the "value of the bribe" is more appropriate. Disagreement arises, however, over whether the calculation of the value of the bribe should be a net calculation or a gross calculation. The government and the PSIRs contend that the value of the bribe should be the gross amount of all bribes solicited, received, offered, or paid. The defendants contend that the value of the bribe should be the net value of the remunerations received after the amount of benefits to the government have been taken into account. The court is persuaded that the value of the bribe must be a gross amount. In the first place, U.S.S.G. commentary indicates that the value of the benefit is a net calculation, see U.S.S.G. § 2C1.1 cmt. 2, *referenced in* § 2B4.1 cmt. 2, but is silent on whether the value of the bribe is a net calculation. Moreover, all but one of the cases located by the court that discuss a "net calculation" under 2B4.1 [15] do so in the context of calculating the value of the benefit received. See, e.g., *United States v. Jain*, 93 F.3d 436, 443 (8th Cir.1996); *United States v. Kummer*, 89 F.3d 1536, 1545 (11th Cir. 1996). The one case that uses a net amount in calculating the value of the bribe does so in reliance on a case that used a net amount to calculate the value of the benefit. See *United States v. Wester*, 90 F.3d 592, 598–99 (1st Cir.1996), *citing U.S. v. Fitzhugh*, 78 F.3d 1326, 1331 (8th Cir.1996) ("In *Fitzhugh*, the court was concerned with valuing the improper benefit conferred on the borrower by a loan obtained by bank bribery.") *Wester* mixes the "value of the bribe" standard and the "value of the benefit" standard without explanation, and the court is not persuaded to follow suit.

Concluding that the value of the bribe must be a gross amount is only the first step in the court's calculation of the value of the bribe. Next, the court must decide

---

**15.** The cases that the defendants cite in support of a net calculation are based on U.S.S.G. § 2F1.1, and are inapplicable to U.S.S.G. § 2B4.1.

what portion of the remunerations solicited by the LaHues and/or given by the hospitals were in exchange for patient referrals and thus were "bribes" rather than legitimate business transactions. At trial, the jury was required to convict if the referral of patients was *at least in part* in exchange for the remunerations. *See* Jury Inst. 33. All that is certain under the jury's conviction, then, is that the *full* amount of the remunerations cannot be attributed to legitimate business transactions and *some part* of the remunerations were in exchange for bribes.

 The defendants argue that many of the transactions included as "bribes" in the PSIRs were really legitimate transactions. Based on the evidence presented at trial, the court is prepared to rule on some of the defendants' objections, but defers ruling on others until additional evidence and argument is presented at the sentencing hearing. First, the PSIRs recommend inclusion of the salary of the temporary employee hired by Baptist to complete laboratory billing. The court finds that the government has failed to prove that providing the services of the temporary employee was a bribe by Baptist to the LaHues. Rather, as the court noted in its previous order, "the project resulted in a nice net income for the hospital." [16] Thus, the court sustains the defendants' objection. Second, the PSIRs recommend inclusion of the lease that Baptist assumed for the LaHues. The court sustains the defendants' objection to such inclusion because Baptist had legitimate business reasons for assuming the lease. [17] Third, the

PSIRs recommend inclusion of the value of .the use of cars and a phlebotomist provided to the LaHues by Baptist. The court finds that the government's evidence at trial failed to show that the car and phlebotomist were not provided as part of an arms-length, legitimate agreement. The court sustains the defendants' objection against inclusion. Fourth, the PSIRs recommend inclusion of lab debts owed by the LaHues and uncollected by Baptist. Evidence at trial indicated that Baptist intended to collect the debt but that the debt became uncollectible when BVMG went bankrupt. Thus, the court sustains the defendants' objection and finds that the uncollected debt was not a bribe. Fifth, the PSIRs recommend inclusion of the $100,000 line of credit created by Baptist but not drawn upon by the LaHues, on the theory that the LaHues "solicited" it illegally or that the hospital "offered" it illegally. The court finds that the government failed to present evidence at trial that the line of credit had any value; there is no evidence that any of the parties did not intend the loan to be repaid as part of an arms-length transaction. [18] Therefore, the court will not include the line of credit as a bribe. The defendants' objection is sustained. Sixth, the PSIRs recommend inclusion of the proposed 1993 loan from Baptist to the LaHues. Baptist ultimately rejected the LaHue's proposal. The court sustains the defendants' objection for the reason given above—the government presented no evidence that the parties did not intend the loan to be repaid as part of an arms-length transaction.

---

**16.** *United States v. Anderson,* 85 F.Supp.2d at 1059 (D.Kan.1999).

**17.** *See United States v. Anderson,* 85 F.Supp.2d at 1060 (D.Kan.1999) (finding that the lease "constituted a beneficial business arrangement from Baptist's perspective, allowing Baptist to aquire needed space at a favorable rate").

**18.** *See United States v. Anderson,* 85 F.Supp.2d at 1060 (D.Kan.1999). Even if the amount of credit were deemed a bribe, case

law suggests that it would be improper to value the loan at its face value. *See United States v. Kummer,* 89 F.3d 1536, 1545 (11th Cir.1996) (Logan, J., sitting by designation) (in calculating value of a "prohibited payment" under U.S.S.G. § 2E5.1 (dealing with bribes and gratuities) it would likely be improper to accept the face value of a loan, given as a "prohibited payment," as the value of the prohibited payment; "[t]he value of a loan to a borrower may also be less than the face amount.").

The PSIRs next recommend inclusion of the solicitation of Baptist by the LaHues for a $30,000 increase in consulting fees. This was a blatant attempt by the LaHues to obtain illegal remuneration and the court overrules the LaHue's objections. However, Mr. Anderson specifically refused the solicitation, thereby refusing to expand the scope of the conspiracy. Thus, the court sustains Mr. Anderson's objection to the inclusion of this amount in determining his sentence.

The PSIRs also recommend inclusion of the LaHues' proposal to have Baptist purchase Johnson County Medical Laboratories, Inc. (JCML) for $3.2 million. Because Mr. Anderson outright refused the purchase, the court sustains his objection against inclusion of this amount as to him. However, the court will defer ruling on the LaHue's objections until it hears evidence as to the fair market value of JCML. Only the difference between the fair market value and the proposed purchase price would be considered the solicitation of a bribe.

The court defers ruling on the remainder of the defendants' objections to the PSIRs' recommendations based on the lack of evidence before the court as to these issues. The PSIRs recommend inclusion of the "consulting fees" paid by Baptist to Ronald LaHue, Robert LaHue, and BVMG. The government presented little evidence at trial as to the appropriate allocation of these fees as payment for legitimate services received by the hospital and as payment made in exchange for patients. Likewise, the government presented inadequate evidence for the court to rule as to the PSIRs' recommendations that the salary of Tom Eckard be included. At the sentencing hearing, the government must prove by a preponderance of the evidence how much of the salary was actually remuneration to BVMG, as opposed to a legitimate Baptist expense. The PSIRs also recommend inclusion of the consulting fees paid to BVMG by hospitals other than Baptist and solicitations made by BVMG to hospitals other than Baptist. The government concedes and the court agrees

that these amounts should not be included as to Mr. Anderson; the bribes were not paid in furtherance of any conspiracy to which Mr. Anderson was a party. As to the LaHues, however, the court will defer ruling until the government has an opportunity at the sentencing hearing to present evidence as to what proportion of the consulting fees exceed the fair market value of the services actually performed by the LaHues or, in the case of the unaccepted solicitations, the services which the LaHues contemplated performing.

## VIII. Mitigating Role Reduction for Dan Anderson and Ronald LaHue

 Mr. Anderson and Ronald LaHue each object to the PSIRs failure to recommend a two-level reduction in their sentence based on their allegedly mitigating roles in the offense. U.S.S.G § 3B1.2 states that a two-level reduction may be given if the defendant is "substantially less culpable than the average participant." Comment 2, however, states, "It is intended that the downward adjustment for a minimal participant will be used infrequently. It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload *part* of a *single* marihuana shipment ...." U.S.S.G § 3B1.2, cmt. 2. (emphasis added). In light of the evidence discussed in Section III above, showing that Mr. Anderson was an organizer and leader in the bribery scheme, the court is not convinced that he was "substantially" less culpable than the other participants in the scheme. Likewise, although Ronald LaHue did not have a leadership role in the scheme, he certainly did more than participate in "part" of a "single" transaction. Accordingly, the court overrules Mr. Anderson's and Ronald LaHue's objections on this issue.

## IX. Obstruction of Justice Enhancement for Robert LaHue

The PSIR recommends a two-level enhancement for Robert LaHue, pursuant to

U.S.S.G. § 3C1.1, for obstruction of justice. The PSIR adopts the government's allegations that on September 6, 1993, Robert LaHue threatened witness Karen Hamlin that he would have someone "take care of her" if she reported BVMG's use of unlicenced physicians to the authorities. Robert LaHue objects to the enhancement, claiming that 1) he did not threaten Ms. Hamlin, 2) even if he did threaten Ms. Hamlin, the threat did not relate to the kickback scheme, and 3) even if he did threaten Ms. Hamlin, the government has not met its burden of showing a nexus between the threat and an investigation into the kickback scheme. Robert LaHue's objections present questions of fact that the court is reluctant to rule on until it has heard more evidence from the parties at the sentencing hearing. In an effort to facilitate the hearing, however, the court will set forth the legal standards for obstruction of justice below.

■ The sentencing guidelines require a two-level obstruction of justice enhancement "if a defendant willfully obstructed or impeded ... the administration of justice during the investigation ... of the instant offense." U.S.S.G. § 3C1.1 (1996).[19] This guideline encompasses two distinct requirements. First, the Tenth Circuit has held that "[t]he conduct relied on to support an obstruction of justice enhancement *must relate to the crime of conviction."* United States v. Levy, 992 F.2d 1081, 1083 (10th Cir.1993) (emphasis added) (reversing and remanding for resentencing where obstructive conduct related only to a closely related offense); *see also United States*

v. Gacnik, 50 F.3d 848, 853 (10th Cir.1995) ("[W]e continue to agree [with the Eighth Circuit] that '[t]he conduct relied upon to support an obstruction of justice enhancement must relate to the crime of conviction.' "), *quoting United States v. Dortch,* 923 F.2d 629, 631–32 (8th Cir.1991) ("instant offense" refers to "offense of conviction.").[20] Second, in order for U.S.S.G § 3C1.1 to apply, there must be a nexus between the obstructive conduct and the investigation into the offense of conviction. The Tenth Circuit described the nexus requirement in *Gacnik:*

> To our mind, the clear language of § 3C1.1 enunciates a nexus requirement that must be met to warrant an adjustment. This requirement is that the obstructive conduct, which must relate to the offense of conviction, must be undertaken during the investigation .... Obstructive conduct undertaken prior to an impending investigation, ... prior to any indication of an impending investigation, ... or as regards to a completely unrelated offense, does not fulfill this nexus requirement.

*Gacnik,* 50 F.3d at 852.

In accordance with these two requirements, the court will sustain Robert LaHue's objection if the government is unable to prove at the sentencing hearing that the alleged threat was connected to the Medicare kickback offenses and that on September 6, 1993, the date of the alleged threat, an investigation into the kickback scheme was in progress. If the government overcomes these legal impedi-

**19.** The court uses the pre–1998 version of U.S.S.G. § 3C1.1 because the defendants' crimes occurred from the Fall of 1984 through January 1995. On September 1, 1999 the court ordered the government and counsel for Robert LaHue to brief it on which version of the section, the current 1998 version or the pre–1998 version, should apply (doc. 471). On September 8, 1999, the parties informed the court that they agree that the pre–1998 version of U.S.S.G. § 3C1.1 should apply.

**20.** The government claims that "instant offense" includes both the offense of conviction and closely related cases. In support of this argument, the government cites *United States v. Bernaugh,* 969 F.2d 858 (10th Cir.1992). However, the government extends the *Bernaugh* holding too far. *Bernaugh* merely states that an "offense" may include concerted criminal activities, such that an enhancement may apply if a defendant attempts to obstruct justice in his co-defendant's case. *See id.* at 861. The more recent Tenth Circuit cases cited by the court clearly set forth the current standard.

ments to the obstruction of justice enhancement, it will then have to prove by a preponderance of the evidence that Robert LaHue actually threatened Ms. Hamlin.

### X. The Imposition of a Fine upon Ronald LaHue

Ronald LaHue requests the court not to impose a fine upon him because of his dire financial straights. U.S.S.G. § 5E1.2(a) requires the court to impose a fine "in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." The amount of fine is driven by the ultimate offense level. See U.S.S.G. § 5E1.2(c)(3) (providing fine guideline ranges). The court will determine Ronald LaHue's ultimate offense level at the sentencing hearing and will evaluate his ability to pay a fine at that time.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the government's objection as to the "vulnerable victim" enhancements is overruled and the government's objection as to the "role in the offense" enhancements is sustained in part and overruled in part. The parties' objections as to the "use of special skills" enhancements is sustained. The defendants' objections as to the version of the offense and as to the "abuse of trust" enhancements are sustained. Mr. Anderson's and Ronald LaHue's objections as to the "mitigating role" reduction are overruled. The defendants' objections to the guideline used for determining the base offense level for the "value of the bribes" enhancement is overruled. Finally, the court sustains in part, overrules in part, and defers deciding in part the defendants' objections to the calculation of the amount of the bribes.

The court reserves the following issues for the upcoming sentencing hearing: the defendants' objections as to the calculation of the value of the bribes, the government's objection as to restitution, Robert LaHue's objection as to an "obstruction of justice" enhancement, and Ronald LaHue's objection as to the imposition of a fine.

**IT IS SO ORDERED.**

## MEMORANDUM AND ORDER ON DENIAL OF RECONSIDERATION

This is a complex criminal prosecution involving allegations of Medicare fraud. On October 6, 1999, the court issued a Memorandum and Order resolving in advance of the sentencing hearings, which are set to commence on October 25, 1999, post-trial motions related to sentencing issues (doc. # 479). On October 18, 1999, the government filed a motion for reconsideration of the court's October 6, 1999 order (doc. # 485). For the reasons set forth below, the motion to reconsider is denied.

### I. Legal Standard

■■■■■■ [1–5] The court has previously addressed the legal standard applicable to a motion to reconsider filed in a criminal case. The court adopts this standard verbatim:

> Because there is no provision for a motion to reconsider in the Federal Rules of Criminal Procedure, federal courts recognize motions to reconsider pursuant to the common law doctrine recognized in *United States v. Healy,* 376 U.S. 75, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964). *See also United States v. Dieter,* 429 U.S. 6, 8 n. 3, 97 S.Ct. 18, 50 L.Ed.2d 8 (1976) ("The Court of Appeals' concern with the lack of a statute or rule expressly authorizing treatment of a post-dismissal motion ... ignores our having grounded our decision in *Healy,* not on any express authorization ... but rather on 'traditional and virtually unquestioned practice.' ") (quoting *Healy,* 376 U.S. at 79, 84 S.Ct. 553); *United States v. Corey,* 999 F.2d 493, 495 (10th Cir.1993). Such motions are essentially treated the same as motions to alter or amend judgment in the civil context under Fed.R.Civ.P. 59(e). *United States v. Schweibinz,* No. 93–40001–06–SAC, 1994 WL 129998, at *1 n. 1 (D.Kan. March 15, 1994). The motions allow a party to allege fundamental legal errors that require the court to reconsider an earlier decision. *Federated*

Mut. Ins. Co. v. Botkin Grain Co., 856 F.Supp. 607, 609 (D.Kan.1994). They should be granted only "to correct manifest errors of law or to present newly discovered evidence." *Phelps v. Hamilton,* 122 F.3d 1309, 1324 (10th Cir.1997). The opportunity to present a motion to reconsider should not be viewed as a second opportunity "for the losing party to make its strongest case or to dress up arguments that previously failed. *Schweibinz,* 1994 WL 129998, at *1 n. 1. Whether to grant or deny a motion to reconsider is committed to the district court's sound discretion. *Phelps,* 122 F.3d at 1324.

*United States v. Anderson, et. al.,* 1999 WL 79656, at *1 (D.Kan. Jan.22, 1999).

## II. Vulnerable Victim Enhancement

▉▉ [6] The government first objects to the court's finding that the PSIRs properly excluded a vulnerable victim enhancement to the defendants' sentences. The government asserts that, "Although the general rule is that a sentencing court applies the version of the Guidelines in effect at the time of sentencing, if the later version imposes harsher punishment and implicates the Ex Post Facto Clause, the Court applies the guidelines in effect at the time of the defendant's offense. *See United States v. Nichols,* 169 F.3d 1255, 1270 n. 3 (10th Cir.) *cert. denied,* —— U.S. ——, 120 S.Ct. 336, 145 L.Ed.2d 262 (1999)." The government thereby requests the court to apply the 1994 version of U.S.S.G. § 3A1.1, which was in effect until November 1, 1995, rather than the current version of the guideline. The 1994 version of U.S.S.G. § 3A1.1, Application Note 1, states: "This adjustment applies to offenses where an unusually vulnerable victim is made a target of criminal activity by the defendant." The government argues that under the "target" language, an enhancement is possible where the "targets of the defendant's crimes are unusually vulnerable, even if another entity suffers the financial loss." Relying on *United States v. Stewart,* 33 F.3d 764, 770 (7th Cir.1994), the government claims that this

view of a victim as a target is the majority view.

▉▉ [7] The court agrees that the 1994 version of the guideline should be applied to Robert LaHue. U.S.S.G. § 1B1.11, often called the "one-book rule," requires that if the court applies the Guidelines Manual in effect on the date that the offense was committed in sentencing a particular defendant, then the court must apply that Guidelines Manual in its entirety to such defendant. In its October 6, 1999, Memorandum and Order, the court relied on the 1994 version of U.S.S.G. § 3C1.1 in discussing the applicability of the obstruction of justice enhancement to Robert LaHue. Under the one-book rule, the court must also apply the 1994 version of U.S.S.G. § 3A1.1 to Robert LaHue when making a ruling on the vulnerable victim enhancement.

▉▉ [8] The court rejects the government's argument that the 1994 version of the guidelines should apply as to Ronald LaHue and Dan Anderson. The obstruction of justice issue does not apply to them and the current version of the guidelines does not impose a harsher penalty on those defendants. As a result, an Ex Post Facto issue is not raised and the usual directive of U.S.S.G. § 1B1.11 to use the manual in effect on the date of sentencing controls. Moreover, the government's argued for interpretation, that the 1994 version of § 3A1.1 includes as vulnerable victims vulnerable people who were "targeted" as objects of a bribery conspiracy even if they were not harmed, would impose a harsher result than the 1998 version, a "choice of book" result not mandated by the guidelines at all.

In any event, applying the 1994 guideline does not change the result in this case. The "target" language of the commentary to the 1994 guideline quoted by the government still requires that there be a "victim" before the court can even examine if that victim was the target of criminal activity. The court has determined that the

patients were not victims because they suffered no actual or intended harm. The court cited a long string of cases, four decided prior to the guideline change, applying the vulnerable victim enhancement only when the victim suffered actual or intended harm. *See* Oct. 6 Order at 1091–92. The court finds that the government's victim-as-target argument is an attempt by the government to assert an argument that has previously failed. The court has previously addressed this argument, stating: "The government argues that if a person is used as an instrumentality of the defendant's crime, then that person is a 'victim,' regardless of not having suffered harm or loss. All but one of the cases that the government cites, however, involve victims who have suffered actual or intended harm or loss. Furthermore, the court declines to follow *United States v. Stewart*, 33 F.3d 764 (7th Cir.1994), the one case holding that 'victims' need not have suffered a concrete loss." Oct. 6 Order at 1092. The court devoted over two pages in its previous order distinguishing the *Stewart* case on which the government relies. *See* Oct. 6 Order at 1091–93.[1] A motion to reconsider is not the place for the rehashing of old arguments.

Based on the standard in the preceding sentence, the court also refuses to consider the government's old arguments that the patients involved in this case were harmed. The court stands by its previous decision that the evidence in this case does not show that the patients were harmed. *See* Oct. 6 Order at 1093. The court recognizes the potential for denying patients freedom of choice when referrals are made because of bribes. That potential, however, assumes the availability of other options. What the BVMG/Baptist Continuum of Care clearly did was provide a meaningful opportunity for frail elderly patients to receive hospital care in a coordinated, planned and receptive setting. The facts of this case, in the years in which the activity occurred, are unique. The court is

not persuaded from the evidence presented that there was a choice available for that kind of care. It is, indeed, at the heart of the paradox which this case represents that for such a program for the hospital care of the frail elderly to be economically viable for a hospital it was necessary to ensure a stream of patients. Liberty Hospital attempted to accomplish this through its own captive in house physicians (albeit the evidence in this case does not persuade the court that Liberty's program was a realistic option for BVMG's patients except on a limited basis—which BVMG recognized by making referrals there even absent a consulting arrangement). Baptist pursued such an approach with BVMG, but it was unsuccessful in its efforts to purchase the practice at a reasonable price. It is from there that the entire matter went hopelessly awry. Mr. Anderson was determined to have the program, even, in the end, if it meant paying the Drs. LaHue consulting fees for services not rendered. The LaHues were greedy and demanded compensation for the referral of their patients which exceeded the services they were able or willing actually to provide. But, the program happened, and all the evidence at trial pointed to it being beneficial to patients and literally filling a void which otherwise would have meant no such comprehensive care existed. Perhaps the government is aware of other evidence on all of this, but it hasn't presented it to the court and the court is firmly convinced that under the facts of this case a vulnerable victim enhancement would be a travesty.

### III. Ronald LaHue's Role in the Offense

■ [9] The government's second argument is that the court's conclusion that Ronald LaHue was not an organizer or a leader pursuant to U.S.S.G. § 3B1.1 is based on errors of fact. However, the court has previously compared the actions

---

1. Although a small part of the court's *Stewart* discussion notes that *Stewart* was decided under a "now-superseded version of the sentencing guidelines," the remainder of the discussion remains valid and supports the court's conclusion.

of Ronald LaHue to those of the defendant in the recent Tenth Circuit case of *United States v. Anderson,* 189 F.3d 1201, 1999 WL 641864 (10th Cir. Aug.24, 1999), and has concluded that, like the *Anderson* defendant, Ronald LaHue's conduct did not rise to the level of leading, managing, or organizing. *See* Oct. 6 Order at 1096–97. The additional facts argued in the government's motion to reconsider do not alter the court's conclusion.

The government first claims that Ronald LaHue had the wherewithal to accomplish the scheme because he referred the majority of BVMG patients to Baptist. The government has missed the court's point. Ronald LaHue referred patients of BVMG, the entity controlled by Robert LaHue. Moreover, referring the patients was no more than the quid pro quo for the bribe—like the distribution of a controlled substance would be the essence of a drug conspiracy and would not cause the one who distributed to be categorized as a manager, leader, or organizer for that reason alone. The government next claims that Ronald LaHue was a recruiter and coordinator because of seven facts set out on page 7 of the Government's Motion for Reconsideration. The court finds that the facts set out do not change the court's previous analysis of the role in the offense enhancement as applied to Ronald LaHue. *See* Oct. 6 Order at 1096–97. In accordance with the standards set forth in *United States v. Tagore,* 158 F.3d 1124, 1131 (10th Cir.1998), and *Anderson,* 189 F.3d 1201, 1211–12, the court considered the combination of many factors in reaching its decision. Under the totality of the circumstances, the court is not persuaded by a preponderance of the evidence that Ronald LaHue was a manager, leader, or organizer in the sense that the sentencing guidelines envision in providing an enhancement for role in the offense.

### IV. Abuse of Trust Enhancement

The government's third argument for reconsideration is that the court committed errors of law and fact in its decision not to increase the defendants' sentence based on the abuse of trust enhancement. Asserting errors of law, the government claims that the court wrongly concluded that the victim of the abuse of trust and the victim of the offense conduct must be the same. The government contends that this error arose out of the court's reliance on fraud, rather than on bribery, cases. Citing a Northern District of Indiana tax evasion case, the government alleges that the proper viewpoint from which to consider the issue is that of the alleged victims of abuse of trust—the patients and hospital trustees in this case—not that of the alleged victim of the crime. However, the court notes that this argument is the direct opposite of the argument previously taken by the government in the Government's Sentencing Memorandum at page 51. There, the government asserted: " 'Whether a position is one of 'trust' within the meaning of § 3B1.3 is to be viewed from the perspective of the *offense victims.*" Govt's Sent. Memo at 51, quoting *United States v. Wright,* 160 F.3d 905, 910 (2d Cir.1998) (emphasis added). In its earlier order, the court recognized that there are no Tenth Circuit cases enhancing for abuse of trust in the bribery context, but noted that the Tenth Circuit had allowed enhancements in the fraud context in only "two categories of cases: (1) where employees abuse their position within their own organization to take advantage of the employer, and (2) where someone uses a 'fiduciary or personal trust relationship' to perpetrate the charged offense against the beneficiary of the trust. *United States v. Pappert,* 112 F.3d 1073, 1080 (10th Cir. 1997)." Oct. 6 Order at 1098. The court then applied the Tenth Circuit standard to the facts of this case and determined that no abuse of trust occurred. The court believes that the Tenth Circuit cases it relied upon provide a more appropriate legal standard from which to analyze this issue than the non-Tenth Circuit tax evasion cases cited by the government.

■ [10] Next, asserting errors of fact, the government states, "Even assum-

ing the victim must be harmed, however, the trustees and patients did suffer harm." The government raises for the first time in the context of this issue the argument that the trustees were victims because of the $17.5 million payment made to the government as a result of the bribery scheme. The government also asserts that the trustees were not told that the patient referral scheme was illegal. The government does not elaborate on how Baptist paying the $17.5 million harmed the trustees as individuals, the court notes. Moreover, the government does not provide any authority for the proposition that or discuss whether the guidelines actually envision categorizing the corporation on whose behalf a bribe is paid (let alone its governing board) as a victim of the consequences of the bribe being uncovered. The court rejects the government's motion to reconsider on these bases. The government has already argued and the court has already determined that the patients were not harmed. Further, even if it were true that the trustees were harmed by the $17.5 million settlement, an allegation that has not been discussed in the parties' papers, the court has found that the trustees were kept fully informed of the negotiations and transactions with the LaHues. *See* Oct. 6 Order at 1098–99. Thus, the trustees' alleged harm would be due to their own actions or lack of actions, not to an abuse of trust by Anderson. The government's argument on this point simply extends too far and the logic of it would make any business organization's agent whose criminal conduct led to a civil settlement subject to an abuse of trust enhancement. The guidelines provide no basis for that sweeping proposition.

## V. Version of the Offense

The government next protests the court's adoption of the court's prior rendition of the facts in its July 21, 1999, Memorandum and Order. The government

contends that this method of setting the version of the offense is insufficient to meet the dictates of Fed.R.Crim.Pro. 32(c)(1).[2] First, the government claims that the court must make specific findings with regard to each of the defendants' objections to the Statement of Offense Conduct. The court agrees. The defendants objected generally to the entire version of the offense stated in the PSIR. The court sustained the defendants' objection and found that the PSIR version of the offense was not accurate. *See* Oct. 6 Order at 1103. Since the court had already set forth the majority of its specific findings of fact relevant to sentencing in its July 21, 1999, Memorandum and Order, the court adopted pages *1–20 of its earlier order and appended these findings to the PSIR reports as directed by Fed. R.Crim.Pro. 32(c)(1). *See* Oct. 6 Order at 1103.

The government also argues that the July 21, 1999 Memorandum and Order is incomplete as to the Olathe and Charter solicitations. These solicitations are only relevant to sentencing to the extent that they are included in the value of the bribe calculation. The court, however, declined to make a Rule 32(c) ruling on these issues in its October 6, 1999, Memorandum and Order. In that order, the court deferred deciding the defendants' objections as to including these solicitations in the value of the bribe calculation. *See* Oct. 6 Order at 1106–07. Rule 32(c) requires that the court either make a "finding on an allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing." Because the court has not yet determined whether the Olathe and Charter solicitations will affect sentencing, the court will not make its Rule 32(c) ruling until the sentencing hearing. To the extent that facts discussed in the PSIRs are not included in the court's July 21, 1999, Memorandum and Order and are

---

2. Fed.R.Crim.Pro. 32(c)(1) requires that for each "objection to the presentence report … the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing."

not ruled upon by the court at the sentencing hearing, the court determines that no finding is necessary as to those facts because they will not affect sentencing.

Second, the government argues that the July 21, 1999 Memorandum and Order is not appropriate as a Rule 32(c) finding because those findings were developed under a "beyond a reasonable doubt" standard, rather than the "preponderance of the evidence" standard appropriate in sentencing. The court rejects this argument. As the trier of fact for sentencing purposes, the court disagrees with the government's version of the facts. The government's version was the basis of the PSIR version of the offense, and was adopted verbatim in many instances. In its July 21, 1999, Memorandum and Order the court set out the facts as it believes they exist under any standard of proof. Unlike the version of the offense set forth by the government and adopted in the PSIRs, the court's version of the offense is based on the court's objective findings of fact.

Finally, the government argues that "the defendants have not been given an opportunity to dispute the factual findings in the Courts July 21st Memorandum and Order, which might give rise to additional Rule 32(c)(1) claims." The court finds it interesting that the government is concerned with protecting the defendants whom it has so vigorously prosecuted. The government's concern is misguided, however. If the defendants disagreed with the court's finding that its July 21, 1999, Memorandum and Order correctly set forth the facts, the defendants could have filed their own motion to reconsider with the court. The defendants will have additional opportunities at the sentencing hearing to make their objections known to the court.

## VI. Calculation of the Bribe

■ [11] The government next asks the court to reconsider its ruling regarding the calculation of the bribes. Essentially, the government gives two reasons for the request. First, the government argues that it should not be required to offer evidence of allocation between legitimate services and remunerations because the government has taken the position that none of the benefits given the LaHues were for legitimate services. The court believes that it is the government's prerogative whether or not it presents evidence at the sentencing hearing regarding this issue or whether it is content to make argument on the record made at trial. Perhaps the government will do a better job of persuading the court at the hearing than it did in its sentencing memorandum that the trial record provides an adequate basis for the factual findings necessary. The court does not agree that it is necessarily an "either/or" proposition—that either there was no part of the payments which represented value for services to Baptist other than referrals or that the services equaled or exceeded the payments. The jury rejected the latter choice, as the court would have also done, but that doesn't mean the former alternative is the only one. In any event, the legal analysis requiring that the value of the bribes, as a gross amount, be proved by the government stands valid. *See* Oct. 6 Order at 1105–07. Accordingly, the court will not reconsider its allocation of proof.

Second, the government argues that the court inappropriately ruled that the following, viewed as individual transactions, were not "bribes": (1) salary of temporary employee, (2) the lease that Baptist assumed, (3) BVMG's use of a car and phlebotomist, (4) the uncollected lab debt, (5) the unused line of credit, and (6) the proposed 1993 loan. The government argues that the court should have viewed these transactions in the context of the entire case, not individually. The court rejects the government's argument. The court obviously views this case differently than the government in light of the evidence to which the court has been exposed. Based on the evidence presented at trial, the court believes that the defendants generally desired to engage in legitimate transactions. In at least the six instances set forth above, the defendants succeeded. Those

were not bribes. In other instances, as evidenced by the defendants' convictions, the defendants intentionally failed. The court will only sentence the defendants for their failures.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the Government's Motion for Reconsideration of the Court's October 6th Memorandum and Order is denied.

**IT IS SO ORDERED.**