FILED
United States Court of Appeals
Tenth Circuit

October 25, 2007

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

REDD ROCK SERAWOP,

Defendant - Appellant.

No.06-4022

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:03-CR-339-PGC)**

---

G. Fred Metos, McCaughey & Metos, Salt Lake City, Utah for Defendant-Appellant.

Diana Hagen, Assistant United States Attorney (with Stephen J. Sorenson, Acting United States Attorney, on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.

---

Before **KELLY**, **HENRY**, and **ALARCÓN**,[*] Circuit Judges.

---

**HENRY**, Circuit Judge.

---

[*] Honorable Arthur R. Alarcon, Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

Redd Rock Serawop was convicted of one count of voluntary manslaughter in the death of his three-month-old daughter Beyoncé Serawop. The court sentenced Mr. Serawop to 120 months' imprisonment and ordered him, under the Mandatory Victims' Restitution Act, 18 U.S.C. § 3663A ("MVRA"), to pay $325,751 in restitution to the Estate of Beyoncé Serawop. Mr. Serawop appeals the restitution order. We affirm.

## I. BACKGROUND

The following background is undisputed. Mr. Serawop was indicted for second-degree murder under 18 U.S.C. § 1111(a) following the death of his three-month-old daughter, Beyoncé, in Indian Country. A jury convicted him of the lesser-included offense of voluntary manslaughter.

 The district court sentenced Mr. Serawop to 120 months' imprisonment and ordered restitution in the amount of $1,509 to be paid to the Ute Indian Tribe for burial (this amount is not in dispute). The district court determined it would aggressively approach other restitution issues in this case and found that it needed additional time to make a final determination of Beyoncé's income lost to calculate the restitution Mr. Serawop would pay to her estate.

Prior to sentencing, the district court, citing its power to "require additional documentation or hear testimony," 18 U.S.C. § 3664(d)(4), sua sponte appointed economist Dr. Paul A. Randle, at a cost of $100 per hour, to prepare a report regarding the victim's possible lost income for purposes of calculating restitution

-2-

under 18 U.S.C. § 3663A. Rec. vol. I, doc. 69, at 7, 21-22 (Dist. Ct. Order, filed Feb. 14, 2004). The district court associated this case with *United States v. Bedonie*, 2:02-CR-00690-PGC (D. Utah), in which it had also appointed Dr. Randle to calculate the lost income of a homicide victim.[**]

Mr. Serawop and the government objected to the appointment of Dr. Randle. Specifically, Mr. Serawop challenged the district court's authority to appoint an expert where no person had lost a source of financial support, such as the victim's spouse or children. The government argued that determination of the victim's lost income "is simply too speculative regarding a three month old infant . . . [and] the United States would be unable to sustain its burden of proof for a finding of restitution based on lost wages." Rec. vol. I, doc. 68, at 1-2. Concluding "that there is a reasonable argument for the imposition of restitution for a deceased victim's lost future income under the [MVRA]," the government subsequently withdrew its objection to the court's appointment of an expert. Rec. vol. I, doc. 79, at 1-2.

---

[**] In *United States v. Bedonie*, the district court originally determined that under the Victim and Witness Protection Act, § 3664, it could not authorize an order for lost income restitution for the victim of involuntary manslaughter. The court sua sponte reopened the case after it had entered judgment, finding that under the MVRA, it was legally obligated to order restitution for the victim's future lost income. The court ordered the defendant to pay lost income restitution in the amount of $446,665 to the victim's mother. *United States v. Bedonie*, 413 F.3d 1126, 1128 (10th Cir. 2005). We reversed the district court, and held it lacked jurisdiction to re-open its original order. We noted that "it [wa]s not 'clear' whether involuntary manslaughter would even qualify as a crime of violence and trigger the provisions of the MVRA." *Id.* at 1130.

-3-

Dr. Randle's first report projected Beyoncé's lost income assuming that (1) as a woman, she would have worked fewer years than a man; and (2) as an American Indian, she would have earned substantially less than a Caucasian. He projected that had she not obtained a high school diploma the present value of her lifetime earnings would be $171,366; had she obtained a high school diploma the present value of her lifetime earnings would be $251,148; and that had she attended some college, that number would be $273,000. Rec. vol. VII, at 24.

The district court ordered Dr. Randle to prepare a second report that did not include reductions based on gender or race. Dr. Randle's revised assessments indicate that Beyoncé's projected lifetime earnings were $308,633 without a high school diploma, $511,623 with a high school diploma, and $576,106 with some college education. 317 F. Supp. 2d 1285, 1314-15 (D. Utah 2004).

At sentencing and in its order, the district court interpreted the MVRA to apply to Mr. Serawop, because Beyoncé, as the "victim" of a homicide, had been "directly and proximately harmed." *Id.* at 1299 (quoting 18 U.S.C. § 3663A(a)(2)); *id.* at 1302-05. As such, the court determined that the statute required it to order Mr. Serawop to pay restitution for Beyoncé's lost income in the wake of her death. *Id.* at 1305. The district court rejected Mr. Serawop's suggestions that the calculation of Beyoncé's potential future lost income was speculative at best, because it would not have accrued until about eighteen years after her death.

The court also rejected Mr. Serawop's argument that the phrase "*reimburse the victim for income lost*" necessarily implied payment for losses that had already occurred. Instead, the court held that the phrase "income lost *as a result of* such offense" supported an award of future lost income because "[i]ncome losses that 'result' from an offense are necessarily losses that occur at some future time." *Id.* at 1306 (quoting 18 U.S.C. § 3663(a)(2)(C) (emphasis added)). Finding nothing ambiguous about the MVRA, and relying on Tenth Circuit precedent that the statute is not punitive, the district court also refused to apply the rule of lenity.

The court proceeded to review Dr. Randle's testimony and relied upon selected parts of his reports. For example, despite Dr. Randle's testimony that standard industry practice would take into account a victim's gender and race, the district court chose to rely on the gender- and race-neutral statistics provided in the second report to calculate Beyoncé's actual lost income. The court found that, "[a]s a matter of fairness, the court should exercise its discretion in favor of victims of violent crime and against the possible perpetuation of inappropriate stereotypes," particularly "where the defendants have deprived their victims of the chance to excel in life beyond predicted statistical averages." *Id.* at 1319.

Over objections from both parties, the court also refused to reduce the restitution award to reflect Beyoncé's projected personal consumption. The court determined that the "MVRA does not permit a consumption reduction." *Id.* at

1324. Because "[t]he court's restitution decision is governed by the MVRA," the language of the statute controls. *Id.* "The statute mandates restitution for 'income lost' - not 'net income lost.'" *Id.* The district court concluded that an award of gross income lost did not produce "any kind of excessive restitution" in part because the award was not a recovery for an estate, as in a civil suit, but rather because it was recovery for the deceased victims. *Id.* at 1325.

The court ultimately adopted Dr. Randle's gender- and race-neutral estimate that Beyoncé would earn $308,633 if she were employed "with less than a high school education, beginning at age 17, for the balance of her worklife." *Id.* at 1322. The district court added $17,118 to reflect the present value of her tribal stipend of at least $80 per month, which Beyoncé would have received from her tribe during her lifetime, and which is not in dispute. The court arrived at a lost income restitution amount of $325,751. *Id.*

In a prior appeal, Mr. Serawop challenged the jury instructions, the restitution award and other aspects of his sentencing. This court did not reach the sentencing issues because it held that the jury had been improperly instructed as to the elements of voluntary manslaughter. We reversed and remanded for a new trial. 410 F.3d 656 (10th Cir. 2005).

On remand, Mr. Serawop pleaded guilty to a superseding felony information alleging voluntary manslaughter in exchange for a 96-month sentence under Rule 11(c)(1)(C). At sentencing, the district court imposed the stipulated

-6-

sentence of 96 months' imprisonment and again ordered Mr. Serawop to pay $325,751 in restitution to Beyoncé's estate for her future lost income.

In a separate written order, the district court adopted its earlier memorandum opinion on restitution and incorporated it into the order. Rec. vol. I, doc. 144 at 2. The district court suggested that its restitution award might actually understate Beyoncé's projected lifetime earnings because Dr. Randle had calculated her earnings from the date of the original sentencing hearing, rather than from the date of her death, and because the "calculations are based on discount rates and inflation rates that arguably are slightly outdated." *Id.* at 3. However, since neither the victim nor either party had requested that the court recalculate the amount, the court chose to "rely on Dr. Randle's earlier information in imposing the award." *Id.* The court noted that Mr. Serawop "preserved all of his objections to the restitution order that he raised during the first sentencing." *Id.* at 2.

In this appeal, Mr. Serawop challenges the restitution award as it relates to Beyoncé's future lost income.

## II. DISCUSSION

Mr. Serawop argues that we must reverse the restitution order because the statute (1) is written in the disjunctive so as not to encompass an award of future income; (2) is meant to "reimburse" for past income lost, rather than project potential future income lost; (3) is ambiguous and is thus subject to the rule of

lenity, which would resolve any ambiguity in favor of Mr. Serawop; (4) does not apply to speculative losses; and finally (5) requires that gender- and race-based statistics and consumption be included in the calculation. As will become apparent, we disagree.

A. Standard of review

We consider de novo the district court's application of the MVRA, and we review the district court's factual findings for clear error and the amount of restitution for abuse of discretion. *See United States v. Visinaiz*, 428 F.3d 1300, 1316 (10th Cir. 2005); *United States v. Wilson*, 416 F.3d 1164, 1170 (10th Cir. 2005). "An abuse of discretion occurs when, for example, the trial court fails to consider the applicable legal standard upon which its discretionary judgment is based." *United States v. Quarrell*, 310 F.3d 664, 678 (10th Cir. 2002) (internal quotation marks omitted). In determining the amount of restitution, the economic circumstances of the defendant are irrelevant. *Id.* (citing 18 U.S.C. § 3664(f)(1)(A)). "Any dispute as to the proper amount . . . of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e). The government bears the burden of proving the amount of loss. *Id.*

B. Background of the MVRA

Courts have no inherent power to order restitution; they may only do so as authorized by statute. *United States v. Gordon*, 480 F.3d 1205, 1210 (10th Cir. 2007). In 1982, Congress enacted the Victim and Witness Protection Act

(VWPA), 18 U.S.C. § 3663, which authorized district courts, within their discretion, to order restitution to victims of criminal conduct. *Id*. § 3663(a)(1)(A). The VWPA requires courts to consider the economic circumstances of the defendant prior to ordering restitution. *See* 18 U.S.C. § 3663(a)(1)(B).

When Congress enacted the MVRA in 1996, it made restitution mandatory in certain cases, particularly crimes of violence and theft crimes with identifiable victims who "suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1). The Senate Report accompanying the MVRA noted that Congress enacted the legislation

> to improve the administration of justice in Federal criminal cases by requiring Federal criminal defendants to pay full restitution to the identifiable victims of their crimes. Crimes for which mandatory restitution would apply include crimes of violence, felony crimes against property (including crimes committed by fraud or deceit), product tampering, and certain drug crimes. . . .
>
> This legislation is needed to ensure that the loss to crime victims is recognized, and that they receive the restitution that they are due. It is also necessary to ensure that the offender realizes the damage caused by the offense and pays the debt owed to the victim as well as to society. . . .

S. Rep. No. 104-179, at 12 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 925, 932 (Dec. 6, 1995).

Unlike the VWPA, the MVRA does not permit a court to consider a defendant's economic circumstances when it imposes restitution. 18 U.S.C. §

-9-

3664(f)(1)(A).  With these exceptions, "[t]he provisions of the VWPA and the MVRA are nearly identical in authorizing an award of restitution."  *United States v. Randle*, 324 F.3d 550, 555-56 & nn.2-3 (7th Cir. 2003).

Under the MVRA, a victim is:

a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2).  The MVRA requires restitution for victims of crimes of violence as defined in 18 U.S.C. § 16.  *Id.* at § 3663A(c)(1) ("This section shall apply in all sentencing proceedings for convictions of . . .  any offense . . . that is . .  a crime of violence . . . .).[***]

Generally, when a court determines that the MVRA applies, the  court is required to "order the probation officer to obtain and include in" the PSR "information sufficient for the court to exercise its discretion in fashioning a restitution order."  18 U.S.C. § 3664(a).  The PSR "shall include, to the extent

---

[***]    Mr. Serawop no longer takes issue with the court's defining Beyoncé's mother as the logical representative of her daughter.  "Beyoncé obviously qualifies as a victim in her own right.  To assume her rights during the proceedings, the court finds Beyoncé's mother . . . a suitable representative."  317 F. Supp. 2d at 1302.  In addition, Mr. Serawop does not dispute that his voluntary manslaughter conviction is for a crime of violence. Nor does he dispute that Beyoncé's mother can assume her daughter's rights for the purposes of § 3663A.  *United States v. Oslund*, 453 F.3d 1048, 1061 (8th Cir. 2006) ("When the crime causes the death of a victim, the representative of that victim's estate or a family member may assume the victim's rights.") (citing 18 U.S.C. § 3663A(a)(2)).

-10-

practicable, a complete accounting of the losses to each victim." *Id.* "After reviewing the [PSR], the [sentencing] court may require additional documentation or hear testimony." 18 U.S.C. § 3664(d)(4). "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A); *see United States v. Barton*, 366 F.3d 1160, 1167 (10th Cir. 2004).

Under the MVRA, the court is obligated to award restitution for various categories of losses, including "income lost" by the victim. The MVRA directs:

> The order of restitution shall require that such defendant-
> (1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense-
>     [(A) and (B) return property or pay designated amount]
> (2) in the case of an offense *resulting in bodily injury* to a victim-
>     (A) pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;
>     (B) pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and
>     (C) *reimburse the victim for income lost by such victim as a result of such offense;*
> (3) *in the case of an offense resulting in bodily injury that results in the death of the victim*, pay an amount equal to the cost of necessary funeral and related services; and
> (4) in any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

18 U.S.C. § 3663A(b) (emphasis added).

The Senate did make one caveat clear, however:

> It is the committee's intent that courts order full restitution to all identifiable victims of covered offenses, while guaranteeing that the sentencing phase of criminal trials *do not become fora for the determination of facts and issues better suited to civil proceedings.*
>
> . . . .
>
> *In all cases,* it is the committee's intent that highly complex issues related to the cause or amount of a victim's loss not be resolved under the provisions of mandatory restitution. The committee believes that losses in *which the amount of the victim's losses are speculative, or in which the victim's loss is not clearly causally linked to the offense,* should not be subject to mandatory restitution.

S. Rep. No. 104-179, at 18-19 (emphasis added). The speculative nature of an award of future lost income to a three-month old infant is squarely before this court.

### C. Mr. Serawop's Arguments

#### 1. The structure of § 3663A(b)

Mr. Serawop first argues that the structure of § 3663A(b)(1)-(4) precludes the restitution award here. He maintains that subsections (1) through (3) apply to specific injuries (property crimes, bodily injury, and bodily injury that results in the victim's death), and subsection (4) serves as a catch-all provision that relates to all bodily injury crimes, where a victim had to partake or assist in the investigation or prosecution of the offense. Under subsection (3), where the bodily injury results in the victim's death, funeral expenses and related services

-12-

make up the restitution award.  According to Mr. Serawop, this interpretation allows for the estates of deceased victims to file, in lieu of a restitution order, civil suits to seek lost income, pain and suffering, and loss of consortium.

The government maintains that to read the statute in the disjunctive, as Mr. Serawop does, produces an anomalous result:  a deceased victim of bodily injury receives relatively little restitution ("pay an amount equal to the cost of necessary funeral and related services"), while a maimed victim receives more ("reimburse the victim for income lost by such victim as a result of such offense").  We agree with the government that the MVRA applies to the crime of voluntary manslaughter, which undisputedly involves bodily injury.  *See United States v. Cienfuegos*, 462 F.3d 1160, 1164 (9th Cir. 2006) ("It would be illogical to assume that the ultimate death of a person who suffered bodily injury eliminates restitution for lost income."); *cf. Oslund*, 453 F.3d at 1062 ("When an offense causes bodily harm to a victim, restitution must be ordered for medical or psychological treatment, costs of therapy and rehabilitation, and 'income lost by such victim as a result of such offense.'  18 U.S.C. § 3663A(b)(2).  If the victim dies, funeral and related expenses *are also* included. 18 U.S.C. § 3663A(b)(3).") (emphasis added).

We acknowledge that § 3663A is not well-drafted.  Specifically, the Act would benefit from the inclusion of instructive grammatical conjunctions (like a well-placed "and" or an "or") or modifiers (such as "*only* applies to this

subsection"). Despite these deficits, we reject Mr. Serawop's suggestion that § 3663A does not allow the district court to order restitution awarding future lost income for victims of voluntary manslaughter.

### 2. The definition of "reimburse"

Mr. Serawop next argues that, should we read § 3663A to include lost income to be paid to the victim of bodily injury, even where that victim has died as a result of the bodily injury, the district court still abused its discretion through the award of future income. Mr. Serawop reminds the court that § 3663A is remedial and seeks to "reimburse" or pay *back* a loss, rather than pay forward for a loss not yet incurred. Future income, by definition, is unearned, and cannot be paid *back*.

For support, Mr. Serawop points to the Seventh Circuit's statement regarding identical language in § 3663, which reiterated that, under the VWPA, "projecting lost future earnings has no place in criminal sentencing if the amount or present value of those earnings is in dispute." *United States v. Fountain*, 768 F.2d 790, 802 (7th Cir. 1985). Because the calculation process could be an unduly complicated one, and because "'[f]uture' is not in the statute," the VWPA did not require the calculations of future lost earnings. *Id.*

Mr. Serawop also looks to the legislative history of the MVRA for support of his contention that the imposition of restitution should be a backward, not a forward looking one.

> The principle of restitution is an integral part of virtually every formal system of criminal justice, of every culture and every time. It holds that, whatever else the sanctioning power of society does to punish its wrongdoers, it should also ensure that the wrongdoer is required to the degree possible to *restore the victim to his or her prior state of well-being*.

S. Rep. No. 104-179, at 12-13 (emphasis added); *see Hughey v. United States*, 495 U.S. 411, 416 (1990) (observing that the "meaning of 'restitution' is restoring someone to a position he occupied *before* a particular event") (emphasis added); *United States v. Coriaty*, 300 F.3d 244, 253 (2d Cir. 2002) (holding that the "statutory focus" of the MVRA is "upon making victims *whole*") (emphasis added). Under Mr. Serawop's theory, an award of future lost income is incompatible with restoring a victim to her *prior* state of well-being.

The government argues, and the district court found, that because future income is lost to the victim as a direct *result* of the crime, the plain language of the statute leads to the conclusion that lost future income can be included in a restitution order. Result is defined as "[t]he effect, consequence, issue, or outcome of some action, process, design, etc." OXFORD ENGLISH DICTIONARY (2d ed. 1989). The district court also noted that Congress also used the phrase "income lost by such victim as a *result* of such offense." 18 U.S.C. § 3663A(b)(2)(C) (emphasis added); *see Cienfuegos*, 462 F.3d at 1164 ("[I]t is plain that the statute allows a representative of the victim's estate or another family member to assume the victim's rights to collect restitution for future lost

income.").

According to the Ninth Circuit, any victim suffering bodily injury or death necessarily incurs the income lost only *after* the injury, i.e. in the future, as a consequence of the defendant's violent act. *See Cienfuegos*, 462 F.3d at 1164. Moreover, the term "lost earnings," which is similar to "income lost," is defined by Black's Law Dictionary to include future earnings:

> lost earnings. Wages, salary, or other income that a person could have earned if he or she had not lost a job, suffered a disabling injury, or died. Lost earnings are typically awarded as damages in personal-injury and wrongful-termination cases. There can be past lost earnings and future lost earnings. <u>Both are subsets of this category, though legal writers sometimes loosely use</u> *future earnings* <u>as a synonym for</u> *lost earnings*. Cf. LOST EARNING CAPACITY.

BLACK'S LAW DICTIONARY 526 (8th ed. 2004) (underlined emphasis added).[****]

Mr. Serawop's argument is logical regarding the definition of "reimburse" standing alone. However, when viewed in context with the balance of the statute,

---

[****] "Future earnings" cross-references "lost earnings." Black's Law Dictionary defines "lost earning capacity" as follows:

> A person's diminished earning power resulting from an injury. • This impairment is recoverable as an element of damages in a tort action. Cf. lost earnings under EARNINGS.
> "To some extent the phrases 'loss of earnings' and 'loss of earning capacity' are used interchangeably. But the preferred view is that they are different concepts. *The former covers real loss which can be proved at the trial; the latter covers loss of the chances* of getting equivalent work in the future." R.F.V. Heuston, Salmond on the Law of Torts 572 (17th ed. 1977).

BLACK'S LAW DICTIONARY (8th ed. 2004) (emphasis added).

it loses steam. For example, "the MVRA does not define 'income' or distinguish between past or future income. However, the statute plainly states that a victim can recover income that is lost due to a crime causing bodily injury, and if that victim dies, then the estate can recover in the victim's place." *Oslund*, 453 F.3d at 1063. Congress clearly intended offenders to pay "*full* restitution to the identifiable victims of their crimes." S. Rep. No. 104-179, at 12 (emphasis added). Therefore we must reject Mr. Serawop's argument that the use of the word "reimburse," when considered in the context of the entire statute and its purpose, precludes recovery of future income lost as a result of Beyoncé's death.

### 3. The rule of lenity

Mr. Serawop next asks the court to apply the rule of lenity to our application of the MVRA. The rule of lenity instructs courts to interpret ambiguous punitive statutes in favor of the accused. *United States v. Ruiz-Gea*, 340 F.3d 1181, 1188 (10th Cir. 2003).

> The rule of lenity applies where a statute is facially ambiguous and resort to the legislative history does not reveal the congressional intent of the language. *See Ladner v. United States*, 358 U.S. 169, 177 (1958). Under these circumstances, courts construe the statute favorably to the criminal defendant. *Id.* The rule applies to substantive, as well as sentencing, statutes. *See generally Hughey v. United States*, 495 U.S. 411, 422 (1990).

*United States v. Wilson*, 10 F.3d 734, 736 (10th Cir. 1993).

The rule of lenity presupposes the application of a punitive, ambiguous statute, and we apply it "only if, after seizing everything from which aid can be

-17-

derived, . . . we can make no more than a guess as to what Congress intended." *Muscarello v. United States*, 524 U.S. 125, 138 (1998) (internal quotation marks omitted). The rule only applies if there is a "grievous ambiguity or uncertainty in the statute," *id.*, 524 U.S. 125, 138 (1998), and thus has no bearing upon an unambiguous statute that is not punitive.

Mr. Serawop argues that the Supreme Court, in dicta in *Hughey*, has indicated that the rule of lenity would apply to the MVRA. We recognize, as did the district court, that the Supreme Court suggested there that the rule of lenity would apply to the similarly worded VWPA if the Court deemed the statute ambiguous, observing:

> Even were the statutory language regarding the scope of a court's authority to order restitution ambiguous, longstanding principles of lenity, which demand resolution of ambiguities in criminal statutes in favor of the defendant, *preclude our resolution of the ambiguity against petitioner on the basis of general declarations of policy in the statute and legislative history.*

495 U.S. at 422 (internal citations omitted) (emphasis added). We also acknowledge that we are "'bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements.'" *United States v. Nelson*, 383 F.3d 1227, 1232 (10th Cir. 2004) (quoting *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996)).

However, as to the award of lost income to the victim of a crime of

violence, we hold that the MVRA is unambiguous.  18 U.S.C. § 3663A(c)(1)(A).

Arguably the statute may be ambiguous as to what *sort* of lost income is implied,

because § 3663A does not clarify whether or not "lost income" is meant to

encompass *incurred* lost income or future lost income, or both.  *Quarrell,* 310

F.3d at 669 ("A statute is ambiguous when it is capable of being understood by

reasonably well-informed persons in two or more different senses.") (internal

quotation marks omitted).  But our reading is consistent with the Eighth Circuit's

view that the plain language suggests lost income encompasses both incurred and

future lost income.  *See Oslund*, 453 F.3d at 1063 (holding that "[b]ecause future

income is income that is lost to the victim as a direct result of the crime, *the plain*

*language of the statute* leads to the conclusion *that lost future income can be*

*included in a restitution order*") (emphasis added).

Even assuming the statute is ambiguous, we have recognized that the

MVRA does not inflict criminal punishment, and thus is *not* punitive.[*****]  *United*

_____

[*****]  We acknowledge that not all circuits share our view.  *See, e.g.*, *United States v. Ziskind*,  471 F.3d 266, 270 (1st Cir. 2006) ("[R]estitution ordered as part of a criminal sentence is a criminal penalty, not a civil remedy."); *United States v. Vandeberg*, 201 F.3d 805, 814 (6th Cir. 2000) ("Restitution is a part of one's sentence under the statutory scheme, and cannot be imposed without giving the defendant an opportunity to be heard."); *United States v. Ramilo*, 986 F.2d 333, 336 (9th Cir. 1993) ("Under the [VWPA], restitution is part of the criminal sentence."); *United States v. Rico Indus., Inc.*, 854 F.2d 710, 714 (5th Cir. 1988) ("Restitution is a criminal penalty."); *United States v. Bruchey*, 810 F.2d 456, 461 (4th Cir. 1987) ("Criminal restitution . . . is part of the sentencing process [and] . . . is fundamentally 'penal' in nature."); *United States v. Sleight*, 808 F.2d 1012, 1020 (3d Cir. 1987) (stating that restitution "is imposed as a part of sentencing and remains inherently a criminal penalty"); *United States v. Satterfield*, 743 F.2d 827, 837 (11th Cir. 1984) ("The history [of the VWPA] is replete with

-19-

*States v. Vizinaiz*, 428 F.3d 1300, 1316 (10th Cir. 2005) ("In the Tenth Circuit, restitution is not criminal punishment."); *United States v. Nichols*, 169 F.3d 1255, 1280 (10th Cir. 1999) (stating that "the district court erred in viewing restitution [under the MVRA] as a punitive act" for purposes of the Ex Post Facto Clause)); *see also United States v. Hampshire*, 95 F.3d 999, 1006 (10th Cir. 1996) (rejecting ex post facto challenge because restitution under the Child Support Recovery Act is not criminal punishment); *United States v. Arutunoff*, 1 F.3d 1112, 1121 (10th Cir. 1993) ("The VWPA's purpose is not to punish defendants . . . but rather to ensure that victims, to the greatest extent possible, are made whole for their losses.").

Despite plausible arguments from other circuits that "[c]riminal restitution rests with one foot in the world of criminal procedure and sentencing and the other in civil procedure and remedy," *United States v. Bruchey*, 810 F.2d 456, 461 (4th Cir. 1987), in this circuit, restitution's two feet remain squarely planted in

_____

references to restitution as part of the criminal sentence. . . . There can be little doubt that Congress intended the restitution penalties of the VWPA to be incorporated into the traditional sentencing structure."). At least four circuits have held that the amendments of the MVRA operate as punishment and would violate the Ex Post Facto Clause if applied retroactively to defendants. *See United States v. Rezaq*, 134 F.3d 1121, 1140-41 n.13 (D.C. Cir. 1998); *United States v. Edwards*, 162 F.3d 87, 91 (3d Cir. 1998) (holding that restitution ordered under MVRA constitutes punishment for purpose of Ex Post Facto Clause analysis); *United States v. Baggett*, 125 F.3d 1319, 1322 (9th Cir. 1997) (same); *United States v. Thompson*, 113 F.3d 13, 15 n.1 (2d Cir. 1997) (same). *But see United States v. LaGrou Distrib. Sys., Inc.*, 466 F.3d 585, 593 (7th Cir. 2006) ("'[R]estitution for harm done is a classic civil remedy' that is administered for convenience by the courts that have entered criminal convictions.") (quoting *United States v. Behrman*, 235 F.3d 1049, 1054 (7th Cir. 2000)).

the field of compensation and remediation. *Visinaiz*, 428 F.3d at 1316; *Nichols*, 169 F.3d at 1279-80; *see also* S. Rep. No. 104-179, at 12 (evincing Congress's intent to "ensure that the offender realizes the damage caused by the offense and pays the debt owed to the victim as well as to society"). We are without power to revisit this precedent, absent en banc review. Thus our conclusion remains that the plain language of the statute encompasses payment of lost earnings.

4. Restitution must be based on actual, not speculative loss

Having determined that the district court was correct to award restitution, include future lost income in that award, and conclude that Mr. Serawop cannot benefit from the rule of lenity, we consider Mr. Serawop's next argument that the MVRA requires an award of actual, not speculative, loss. Mr. Serawop correctly maintains that the MVRA mandates an award "be based on actual loss," which the "government bears the burden of proving." *Quarrell*, 310 F.3d at 678, 680; *see* Aplt's Br. at 34; *Cienfuegos*, 462 F.3d at 1168 ("Any award of future lost income *must not be predicated on speculation* or conduct unrelated to the offense of conviction, as such an award would be inconsistent with congressional intent.") (emphasis added); *United States v. Anderson*, 85 F. Supp. 2d 1084, 1101 (D. Kan. 1999) ("[A] restitution order cannot be based on the actual or intended gain to the defendant; it must be 'based on the amount of loss actually caused by the defendant's offense.'") (quoting *United States v. Messner*, 107 F.3d 1448, 1455 (10th Cir. 1997)). We must decide whether the government has satisfied its

burden here.

As Mr. Serawop emphasizes, the purpose of restitution "is not to punish defendants or to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses." *United States v. Hudson*, 483 F.3d 707, 710 (10th Cir. 2007) (quoting *Arutunoff*, 1 F.3d at 1121). Consequently, a district court that "order[s] restitution in an amount greater than the total loss caused by" the offense thereby "exceed[s] its statutory jurisdiction and impose[s] an illegal sentence." *Id*.

Mr. Serawop further argues that the MVRA does not seek to supplant the recovery of damages in a wrongful death action. He points out that neither consequential nor incidental damages are recoverable under the MVRA, nor are mental anguish and suffering. He declares that "[t]hese types of damages are very similar to damages based on potential earning capacity." Aplt's Br. at 36. Again, Mr. Serawop is correct as to the big picture. *United States v. Barton*, 366 F.3d 1160, 1167 (10th Cir. 2004) (noting "there is general agreement that a restitution order under the MVRA cannot encompass consequential damages resulting from the defendant's conduct" and collecting cases).

Thus, we agree with Mr. Serawop that the MVRA does not provide incidental, consequential, or pain and suffering awards. Mr. Serawop is also correct that Congress did not intend that the MVRA provide for speculative reimbursements. Further, even though a district court has the power to order such

-22-

restitution, Congress clearly recognized such a court may not be the proper

forum:

> It is the committee's intent that courts order full restitution . . . , while guaranteeing that the sentencing phase of criminal trials *do not become fora for the determination of facts and issues better suited to civil proceedings*.

S. Rep. No. 104-179, at 18 (emphasis added). Moreover,

> In *all* cases, it is the committee's intent that highly complex issues related to the cause or amount of a victim's loss not be resolved under the provisions of mandatory restitution. The committee believes that losses in which the amount of the victim's losses are *speculative, or in which the victim's loss is not clearly causally linked to the offense, should not be* subject to mandatory restitution.

*Id.* at 19 (emphasis added). Here, we hold that the district court exercised its

"abundant discretion" when it crafted a restitution order to include the lost

income of Beyoncé. *Oslund*, 453 F.3d at 1063. The district court would also

certainly have been on firm ground, noting the time and complexity of its

subsequent proceedings, to have left such complex matters to a civil

determination. Indeed, it might often be the case that complexity or delay caused

by these determinations should be deferred to a civil forum.

Mr. Serawop cites the Second Circuit's reversal of the district court's

"creative approach" to a restitution order in *United States v. Catoggio*, 326 F.3d

323, 327-28 (2d Cir. 2003), for support of his argument that the district court here

awarded a speculative amount. In *Catoggio*, the court reversed the district court's

restitution award of $80 million to thousands of unidentified victims for

unidentified losses from a complex fraud scheme. Mr. Serawop again reasons that similarly, here, because the victim was a three-month-old infant at the time of her death, an award based on potential earning capacity cannot be based on her actual loss, and thus represents no more than an estimate.

Although the *Catoggio* court – in a RICO action focusing on loss of property – did reverse an $80 million restitution order, its problems with the judgment were not that damages were too speculative to be obtained. In fact the court ultimately remanded the case with guidance as to how to come up with a more accurate number. And, in doing so, it rejected arguments similar to those advanced here.

The Second Circuit noted that the restitution figure was selected from the defendant's plea agreement, but that "neither the parties nor the district court below believed the $80 million figure was an accurate statement of the victims' losses in this case." 326 F.3d at 329. The court ultimately remanded the case so that the district court could enter a new restitution order, based upon proceedings that were underway to determine the victims and their actual losses. *Id.* at 330.

In *Catoggio*, the district court was "aware of the difficulties involved in ordering restitution" in a complicated RICO case that involved nearly 10,000 victims. 326 F.3d at 328. As here, the district court in *Catoggio* "did not consider the process too burdensome," and although the *Catoggio* court's methodology was flawed, it was "understandable." *Id.* at 327-28. In this case, we

have one identified victim, and several carefully detailed and measured analyses of her potential earning capacity that project lost income for the victim using various scenarios. The district court thoroughly cross-examined the expert, and exercised its discretion when it crafted its order.

Here, contrary to Mr. Serawop's suggestions, the district court did not base its conclusions on sheer speculation and hypotheticals; rather, it relied on well-recognized industry standards and norms. We have recognized that "[t]he determination of an appropriate restitution amount is by nature an inexact science." *United States v. Teehee,* 893 F.2d 271, 274 (10th Cir. 1990) (examining VWPA award). "While calculation of future lost income must be based upon certain economic assumptions, the concepts and analysis involved are well-developed in federal law, and thus the district court is not without persuasive analogy for guidance." *Cienfuegos*, 462 F.3d at 1169; *see Hoskie v. United States*, 666 F.2d 1353, 1355-57 & n.2 (10th Cir. 1981) (discussing and applying intricate and complex calculations involved in measuring lost earning capacity for a severely injured two-and-a-half-year-old).

We hold that an award of lost future income for a deceased infant is not precluded by the MVRA. Although the district court may perceive the process as laborious and complex, and therefore decline to grant such an award, the district court may also choose, as it did here, to exercise its abundant discretion and undertake such proceedings.

    5. The district court order's restitution methodology was not an abuse
    of discretion

Finally, Mr. Serawop urges the court to reverse the restitution order

because of the district court's flawed methodology.  First, Mr. Serawop

challenges the court's refusal to abide by the gender- and race-based calculations

that the expert witness Dr. Randle submitted.  Second, Mr. Serawop, and here he

is joined by the government, also argues for a limited remand to dispute the

district court's refusal to adjust the lost earnings figures to reflect Beyoncé's

personal consumption.  We address each argument in turn.

    a. Gender- and race-based statistics

Mr. Serawop argues that the order did not include gender-based or race-

based statistics that, according to Dr. Randle's first report, would offset the award

significantly.  For example, Dr. Randle's first study, which factored in Beyoncé's

status as female American Indian, and assumed she attained less than an high

school education, calculated the present value of her lost earnings to be $171,366.

The second study (using the male tables, because there are no strictly gender-

neutral tables available, and removing the reduction based on her race), resulted

in a calculation of $308,366.  Rec. vol. VII, at 16, 24.  With a high school degree,

the calculations were $251,148 and $511,623, respectively.  Finally, had she

attained some college credits, the lost earnings projections were $273,000 in the

first study and $576,106 in the second.  As to educational level, Dr. Randle stated

that the "most likely scenario" was that Beyoncé would obtain a high school education. *Id.* at 41.

Dr. Randle testified that he has performed lost income analyses "thousands of times" in civil wrongful death and injury cases, but never before in a criminal trial. *Id.* at 29. He stated that with no work history for Beyoncé, he could only calculate a "probable loss of income." *Id.* at 32. He admitted there was no guarantee that she would ever have been employed, or what the nature of her employment might be, or what level of education she might attain. Dr. Randle testified that he believed it was "standard practice" and "appropriate to take gender into consideration" and that he was "not aware of any other economist who's ever made any analysis without considering gender." *Id.* at 34-36. Similarly, Dr. Randle relied on an article from the American Indian Policy Center for the first study that included Beyoncé's race. The article reflects the disparities between pay rates of Native Americans and Caucasians. Although including race was "not a standard technique" that Dr. Randle has used, he testified that he thought it "appropriate" to factor in the racial disparities because of the disparities in earning capacities Native Americans face. *Id.* at 21, 39.

The court rejected application of the gender and racial distinctions, observing that "[a]s a matter of fairness, the court should exercise its discretion in favor of victims of violent crime and against the possible perpetuation of inappropriate stereotypes." 317 F. Supp. 2d at 1319. The court cited *Reilly v.*

*United States*, 665 F. Supp. 976, 997 (D.R.I. 1978) (in awarding damage for lost earnings, noting that "we see no reason to distinguish between the sexes"), *rev'd on other grounds,* 863 F.2d 149, 167 (1st Cir. 1988) (noting that "[i]n an environment where more and more women work in more and more responsible positions, and where signs of the changing times are all around us, it can no longer automatically be assumed that women will absent themselves from the work force for prolonged intervals during their child-bearing/child-rearing years" and rejecting the "sexist aspects" and "antiquated premise" of such a theory), and *Wheeler Tarpeh-Doe v. United States*, 771 F. Supp. 427, 455-56 (D.D.C. 1991) (in calculating lost earnings of a bi-racial child, court considered the average wages of all college graduates as the "most accurate means available of eliminating any discriminatory factors").  The district court then concluded that Mr. Serawop "simply failed to prove that a stereotypical discount is satisfied." 317 F. Supp. 2d at 1317.  "[His] evidence is too speculative and insufficiently connected [to Beyoncé's] income losses." *Id.*  The district court's decision to reject an arguably regressive gender- or race-based approach was within its discretion.

Although we agree the court acted within its discretion, we must annotate the court's sua sponte shifting of the burden to Mr. Serawop, the defendant, to establish the propriety of taking gender or race into consideration.  Section 3664(e), while imposing on the government "[t]he burden of demonstrating the

amount of the loss sustained by a victim," also states that "[t]he burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires." 18 U.S.C. § 3664(e). We hold that the apportionment of this burden to Mr. Serawop to come forward with the amount of offset in this instance was appropriate. *See generally United States v. Ruff*, 420 F.3d 772, 775 (8th Cir. 2005) ("The MVRA does not stipulate which party bears the burden of proving entitlement to an offset."). The ultimate burden of persuasion concerning the amount of loss remains on the government.

### b. Personal consumption

Both Mr. Serawop and the government argue that the district court's award of restitution for future income lost without taking a corresponding consumption deduction violated § 3664(f)(1)(A)'s mandate to award "restitution to each victim in the full amount of each victim's losses . . . ." Aple's Br. at 45; Aplt's Br. at 41. Because a restitution order that does not include any consumption offset awards *more* than full restitution, the district court should recalculate it.

Dr. Randle agreed that his calculations were basically gross income figures that did not account for any personal consumption. "Had [Beyoncé] lived, [she] would have consumed part of that income personally." Rec. vol. VII, at 16. Dr. Randle suggested that Beyoncé's personal consumption would range typically from 12-16 percent of that gross income. *Id*. at 17. Dr. Randle testified that, if he assumed that Beyoncé's lost income meant gross income less taxes less

-29-

consumption, the resulting figure would be "probably very small" as "[m]ost Americans don't save much" and "after consumption, it's all gone." *Id.* at 72. Although Dr. Randle did not provide exact calculations, he stated the figure would be "much less than the gross income figure that [he] gave." *Id.* at 73.

Dr. Randle did provide certain calculations that included a consumption offset under two scenarios:

> first, never married; and, second, married at age 23 with two children at ages 25 and 28. Applying the first scenario to the most conservative of the race- and sex-neutral calculations (no high school graduation) reduced the $308,633 lost income figure by $253,974 for consumption, leaving a present value of lost income net of consumption of $54,659. Applying the second, married-with-children scenario to the same figure produce a consumption offset of $101,258, leaving a present value of lost income net of consumption of $207,375.

317 F. Supp. 2d at 1323-24 (internal citations omitted). The district court noted it obvious "that the assumptions one makes about the future of a victim . . . can make vast differences in the calculations." *Id.* at 1324. The court again concluded that "[t]he burden of proof would be on the party urging a consumption reduction to prove it was justified, and the court finds that such proof has not been made here; the assumptions are simply too speculative." *Id.*

Again, the district court did not abuse its discretion in concluding that Dr. Randle's projections regarding consumption were too wide-ranging to be of any use in determining "actual loss." *Quarrell*, 310 F.3d at 680 (rejecting restitution award under the MVRA based on "hypothetical" loss). As Dr. Randle himself

-30-

stated, "[I]n all honesty. . . if we were to take any of the numbers that I've given you, even less 15 percent, to reflect the personal consumption of the individual decedent, that 85 percent of the numbers that I've given you would probably be too high because it wouldn't honestly reflect the economic value that would have been realized by any of the survivors had [Beyoncé] not been killed."  Rec. vol. VII, at 18.

The district court carefully analyzed and rejected the parties' arguments that an award that did not deduct for consumption produced a "windfall" for Beyoncé's estate:  "While this argument may have some merit in other civil contexts, it is not persuasive in awarding criminal restitution under the MVRA." 317 F. Supp. 2d at 1322.****** The court looked to the statute's language, which refers to "income lost" not "net income lost."  *Id.* at 1324.  The court stated that there is no windfall that could possibly cover the loss of a daughter from criminal violence, noting that "[i]t hardly creates a "windfall" to require the defendants to pay restitution for the consumption that the victims never had the chance to savor."  *Id.* at 1326.  And, unlike a civil setting where the estate is seeking recovery, here the "recovery is for the deceased victims."  *Id.*  Although we caution the court that the suggestion that there is no windfall that could be too

_____

****** Again, we note that the district court again placed the burden of proof on the party urging a consumption reduction to prove it was justified – here those parties are Mr. Serawop and the government.  *See Ruff*, 420 F.3d at 775  ("The MVRA does not stipulate which party bears the burden of proving entitlement to an offset.").

high to cover the loss of a loved one is not a proper sentiment to include in calculating restitution, we hold that the district court did not abuse its discretion when it declined to offset the award for consumption.*******

## III. CONCLUSION

Accordingly, we AFFIRM the district court's restitution order in the amount of $325,751.

_____

******* Our agreement that declining to offset consumption is not an abuse of discretion goes no further than that. We disagree with the district court's statement that "the MVRA does not permit a consumption reduction." 317 F. Supp. 2d at 1324. As the Eighth Circuit deftly pointed out, "Not every case will be overly burdensome though, such as cases where the amount is not in dispute or where it is easily determined." *Oslund*, 453 F.3d at 1063. For example, if the victim was a 65-year old retiree, an expert might present consumption figures that the district court concludes are not speculative and that may be used to offset a restitution award.

The district court should have the power to embrace all the statistical tools that expert evidence suggests go into making the proper analysis. While other factors may suggest to the court that a tool not be used in a certain case, the court should consider the full panoply of expert evidence and science available to it, having chosen to negotiate the model's path in the first place.